[Cite as *State v. Hanford*, 2019-Ohio-2987.]

STATE OF OHIO        )             IN THE COURT OF APPEALS
                           )ss:        NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                     C.A. No.     29204

     Appellee

     v.                           APPEAL FROM JUDGMENT
                                   ENTERED IN THE
ROBERT HANFORD              COURT OF COMMON PLEAS
                                   COUNTY OF SUMMIT, OHIO
     Appellant               CASE No.     CR 2017-10-3621

DECISION AND JOURNAL ENTRY

Dated: July 24, 2019

CALLAHAN, Judge.

{¶1}    Appellant, Robert Hanford, appeals his conviction by the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}    At approximately 10:00 a.m. on Sunday, October 1, 2017, the Twinsburg Police Department received a 911 call reporting that an individual had been stabbed at a residence at the intersection of Darrow Road and Sherwin Drive. When they arrived, Mr. Hanford ran from the house, and officers noted that he appeared to be distraught. Mr. Hanford had bloodstains on his clothing, including a large stain on his left knee.

{¶3}    Inside the house, they found the body of M.B. lying face down between a couch and a coffee table in the living room. M.B. did not bear any wounds that were visible in the position in which he was found, but he was unresponsive. Upon closer examination, officers noted that his skin was gray and "cold to [the] touch"; he had no pulse or signs of respiration.

Although the living room was cluttered and in disarray and there were droplets of blood in some places, the room was notable as the scene of a stabbing because it was relatively free of bloodstains. Underneath M.B.'s body, however, police found a pool of blood. During a preliminary examination at the scene, the medical examiner noted a knife wound to the chest near M.B.'s heart.

{¶4} Mr. Hanford was transported to the police station for questioning, where he initially informed police that he woke up and found that M.B. had been stabbed, but did not know what had happened. He acknowledged that he had been arguing with M.B. and ultimately admitted that he stabbed M.B. once. Although Mr. Hanford did not disclose the location of the knife that he had used immediately, he later informed police that it would be found in the area of a small decorative pond in the front yard of the residence. Armed with this information, police recovered a closed pocketknife at the bottom of the pond.

{¶5} Mr. Hanford was charged with two counts of murder in violation of R.C. 2903.02(A) and 2903.02(B), respectively, and one count of felonious assault in violation of R.C. 2903.11(A). A jury found him guilty of each charge. The trial court merged the counts and sentenced Mr. Hanford to a term of life imprisonment with parole eligibility after fifteen years. Mr. Hanford appealed. His four assignments of error are rearranged for purposes of disposition.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED WHEN IT OVERRULED A TIMELY DEFENSE
MOTION FOR ACQUITTAL PURSUANT TO CRIMINAL RULE 29 AS
THERE WAS NOT SUFFICIENT EVIDENCE PRESENTED BY THE STATE
OF OHIO TO ESTABLISH A PRIMA FACIE CASE OF MURDER TO
WARRANT THE CASE BEING SUBMITTED TO THE JURY.

{¶6} Mr. Hanford's first assignment of error argues that his convictions for murder are not supported by sufficient evidence because the State did not produce any evidence demonstrating that he acted with the intent required to commit murder. This Court disagrees.

{¶7} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). In reviewing the evidence, we do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id*.

{¶8} Murder is prohibited by R.C. 2903.02, which provides, in part:

(A) No person shall *purposely* cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

(Emphasis added.) R.C. 2903.02(A)/(B). As required by R.C. 2903.02(A), "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). Intent must be demonstrated with reference to the surrounding facts and circumstances. *See In re Washington*, 81 Ohio St.3d 337, 340 (1998). "'The intent of an

accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court.'" *Id.*, quoting *State v. Huffman*, 131 Ohio St. 27 (1936), paragraph four of the syllabus.

{¶9} Felonious assault, which is the offense upon which Mr. Hanford's conviction for murder under R.C. 2903.02(B) was predicated, provides that "[n]o person shall *knowingly* * * * [c]ause serious physical harm to another[.]" (Emphasis added.) R.C. 2903.11(A)(1). As R.C. 2901.22(B) explains,

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

If there is sufficient evidence that Mr. Hanford acted purposely, as required by R.C. 2903.02(A), it follows that there is sufficient evidence demonstrating that he acted knowingly, as required by R.C. 2903.02(B) and R.C. 2903.11(A)(1). *See* R.C. 2901.22(E) ("When knowledge suffices to establish an element of an offense, then purpose is also sufficient culpability for such element."). *See also State v. Coleman-Muse*, 10th Dist. Franklin No. 15AP-566, 2016-Ohio-5636, ¶ 10, fn3.

{¶10} M.B. died as a result of a single stab wound to the chest that penetrated the left ventricle of his heart. According to Dr. George Sterbenz, the Summit County Deputy Medical Examiner, the left ventricle is "the muscular pump portion of the heart," and a stab wound in that area results in rapid blood loss. Dr. Sterbenz characterized M.B.'s stab wound as "rapidly fatal." The fatal wound was approximately four inches in length, passing between the fourth and fifth ribs from front to back in a direction that was slightly left-to-right and downward.

{¶11} Dr. Sterbenz explained that M.B. experienced massive loss of blood into the hemothorax, where 800 milliliters of blood collected. That volume of accumulated blood forced the air out of M.B.'s left lung, and the lung collapsed. This mechanism alone, according to Dr. Sterbenz, represented enough blood loss to result in hemorrhagic shock and death. At the same time, however, Dr. Sterbenz noted that the heart continued to pump blood that accumulated in the pleural space, which led to pericardial tamponade, in which the blood accumulating in the pleural space exerts pressure on the heart that leads to loss of circulation:

> It's like putting a tourniquet on your arm to stop the blood from an injury to prevent bleeding out your arm.

> In this case, the tamponade is the squeezing of the blood for the heart; and that's going to make it hard, first, for the heart to pump.

> It's also going to cause the blood vessels that enter and exit the heart to collapse.

> So, pericardial tamponade causes cessation of circulation. Even though the heart is still trying to pump, it's mechanically being prevented from pushing blood [out] of the heart, and it's mechanically being prevented from pulling blood back into the heart; so, circulation stops.

According to Dr. Sterbenz, critical pericardial tamponade, as was present in this case, results in loss of consciousness with seconds and death in a matter of minutes. Dr. Sterbenz also described what would be observed in the moments after such an injury is sustained:

> People that are observed to have injuries that result in pericardial tamponade within seconds will be - - witnesses will say they just fell down, they just collapsed, within less than a minute; and they stopped breathing within, you know, a few minutes.

> They will have agonal, terminal gasping breaths very, very quickly and then they will die. And they are dying so quickly because their brain isn't getting any oxygen.

> * * *

> This alone, the pericardial tamponade, due to this penetrating injury to his heart, the bleeding, the collection of blood around his heart, is going to incapacitate him

extremely rapidly, less than a minute, and within a few minutes he will be completely dead.

Within seconds of sustaining the fatal injury, according to Dr. Sterbenz, M.B. would have been unable to converse or to carry out any directed activity.

{¶12} Dr. Sterbenz also explained that two implications followed from the nature of M.B.'s fatal wound. First, the fatal wound required "a forceful thrust" in order to push the entire length of the knife between the intercostal space, through the chest wall, and into the heart. "This injury," according to Dr. Sterbenz, "represents a lot of force." Along those lines, Dr. Sterbenz also rejected the hypothetical explanation that the fatal wound could have been inflicted by an assailant holding a knife in his right hand and stabbing over his left shoulder. Second, Dr. Sterbenz testified that because the fatal wound expelled an extreme quantity of blood quickly, the condition of the crime scene and the victim's clothing provided significant clues about M.B.'s physical position when the stabbing occurred. According to Dr. Sterbenz, bloodstains that resulted from the injury would be determined by the position of the body and the force of gravity:

> People that have penetrating injuries such as [M.B.] * * * who are actively moving around their environment, the room that they're in, the scene, will bleed all over that scene, and they will have blood all over their body.

> They will have -- people that are standing up and bleeding will bleed downward across their body.

> They will bleed -- injuries to the chest will bleed downward onto your legs, downward onto your feet.

> And if they move to different parts of the room, there will be blood in all of those different parts of the room.

As Dr. Sterbenz noted, however, "[t]hat did not occur here" because "[t]he blood is predominately located only where blood drained out of his body with gravity as he was lying there in the room on that carpet."

{¶13} Other witnesses also testified that the condition of the crime scene in this case was notable. The officers who responded testified that the blood found in the living room consisted of a large, wet pool of blood underneath M.B.'s body, a towel stained with blood on the couch immediately next to where the body was found, smears of blood on the couch itself, and "droplets" of blood on some boxes found nearby. The photographs admitted at trial confirm this description: they depict a room that is cluttered, but largely free of bloodstains. Detective Brian Donato explained that the scene of a stabbing is usually "very messy" with "blood spray all over" because an individual who has sustained a stab wound will ordinarily leave a trail of blood wherever he goes. In contrast, Detective Donato noted that this scene stood out for its relative cleanliness, explaining that the large concentration of blood in the room was found directly under M.B.'s body. He also testified that blood drops found on some boxes near the location of the body, for example, were likely to have come from the motion of the knife being pulled from M.B.'s body; otherwise, M.B. would have lost more blood in the area around the boxes. Detective Donato also noted that the crime scene did not bear any indication of the large-scale cleanup effort that would have been required had M.B. left a trail of blood throughout the room.

{¶14} Given the absence of blood throughout the living room and the fact that the clothing on M.B.'s lower body was also relatively free of bloodstains, Dr. Sterbenz opined that M.B. was stabbed in the location where the body was found. More specifically, Dr. Sterbenz testified that M.B. could have been sitting on the couch or kneeling on the floor, but it is unlikely that M.B. walked to the position near the couch where his body was found or was standing: "If [M.B.] was upright, really for any significant amount of time after he was stabbed, he would have blood dripping from this gaping stab wound to his chest and from his arms down onto the legs of his pants, and there really isn't any blood dripping down onto his pants." He also noted

that M.B. had another, less significant stab wound that passed through his right arm from the outside, out the arm on the inside, and into M.B.'s chest near the armpit. Dr. Sterbenz explained that the track of that wound indicated that M.B.'s arm was pressed up against his body at the time the wound was inflicted. Dr. Sterbenz also noted that there was "a notable absence of * * * defensive injuries" to M.B.'s body, an indication that M.B. may have been "overpowered * * * quickly."

{¶15} Based on this evidence—and making all reasonable inferences in favor of the State—the jury could reasonably conclude, beyond a reasonable doubt, that Mr. Hanford stabbed M.B. while he was in a kneeling, sitting, or lying position in the immediate area where his body fell with such concentrated force that the knife was buried to the hilt in M.B.'s chest, compressing the chest cavity and penetrating the left ventricle of his heart and leading to his death within minutes. In other words, the jury could have reasonably concluded beyond a reasonable doubt that Mr. Hanford acted with the specific intention to cause M.B.'s death, as required by R.C. 2903.02(A).

{¶16} Mr. Hanford's first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 2

THE VERDICT OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE DEFENSE PROVED THE AFFIRMATIVE DEFENSE OF SELF[-]DEFENSE BY A P[RE]PONDERANCE OF THE EVIDENCE[.]

{¶17} In his second assignment of error, Mr. Hanford argues that his convictions are against the manifest weight of the evidence because he proved that he acted in self-defense. This Court does not agree.

{¶18} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.* at 340, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶19} Self-defense is an affirmative defense that must be proven by the accused by a preponderance of the evidence. *See State v. Martin*, 21 Ohio St.3d 91 (1986), syllabus; former R.C. 2901.05(A)/(D)(1).[1] In order to establish self-defense, the defense must prove "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus.

{¶20} Mr. Hanford, who testified at trial, maintains that M.B. ingested drugs and alcohol on the night of the incident and attacked him without provocation. Specifically, Mr. Hanford testified that he and M.B. spent the afternoon and evening of September 30, 2017, which was Mr. Hanford's birthday, consuming beer and "hanging out" in their shared living room. According to Mr. Hanford, the pair consumed a twelve-pack of beer and four to six twenty-four-ounce cans of Steel Reserve between them. They ate no food other than candy bars. Mr. Hanford acknowledged that he smoked some marijuana during the course of the evening, but

---

[1] Significant substantive amendments to R.C. 2901.05 became effective on March 28, 2019. Those amendments are not at issue in this case.

denied that other drugs were involved. He testified that he was aware that their living arrangements would be changing soon, but that they did not argue about that fact. He also denied that he expressed anger toward anyone else that evening. According to Mr. Hanford, he fell asleep in a seated position on a loveseat at some point during the course of the night.

{¶21} Mr. Hanford testified that at some point later, he awakened to find M.B.'s hand on this throat. He explained that he pushed M.B. away, asked what he was doing, and started walking down the hallway. According to Mr. Hanford, M.B. pursued him and grabbed him around his neck. Mr. Hanford testified that he struggled to escape from M.B.'s grip, which tightened around his throat, then reached for his pocket knife. He stated that he swiped behind him, with the knife in his left hand, then transferred the knife to his right hand, swiped the knife in M.B.'s direction over his left shoulder, then swiped again to the left under his arm. At that point, according to Mr. Hanford, M.B. released him. Mr. Hanford testified that when he turned to look at M.B., he noted that M.B. was holding his side. He testified that the following ensued:

> After we had separated, I had - - regained my balance, looked at him, he was holding his side, and I asked him, I said, "Are you all right?" And he shook his head no.
>
> I asked him, "Should I call 911?" He shook his head yes.

Mr. Hanford testified that he ran next door to a neighboring house to call 911, discarding the pocketknife along the way. He explained that he remembered knocking on the neighbors' front door, but that he did not remember anything that happened after that point.

{¶22} Lieutenant Scarl noted that Mr. Hanford's version of the events on the night in question developed over the course of his interview and that Mr. Hanford initially denied any recollection of stabbing M.B. Once he admitted that he remembered the incident, he consistently maintained that he stabbed M.B. over his left shoulder. During his testimony, Mr. Hanford

acknowledged this discrepancy. He also admitted that he had never told police that he awakened to find M.B.'s hand on his throat. Mr. Hanford's testimony also contradicts other witnesses who testified that on the evening of the stabbing, he was angry, aggressive, and upset that he and M.B. were going to be evicted from their residence by M.B.'s family.

{¶23} In support of his version of events, Mr. Hanford notes that Dr. Sterbenz testified that M.B.'s postmortem toxicology tests demonstrated that his blood contained alcohol, amphetamine, and methamphetamine. In his defense, Mr. Hanford also introduced the expert testimony of Robert Belloto, a Ph.D. with expertise in clinical pharmacology and toxicology. Dr. Belloto testified regarding the levels of alcohol, amphetamine, and methamphetamine reflected in the postmortem toxicology results and, by performing a statistical analysis, determined that it was likely that M.B. exhibited adverse effects from those substances prior to his death, which he characterized as "a bad combination" of hallucination and lowered inhibitions.

{¶24} On cross-examination, however, Dr. Belloto acknowledged two things: first, that his analysis did not factor in tolerance levels, which could make a significant difference in the outcome; and second, that statistically speaking, it would be likely that any two men of similar size (as were M.B. and Mr. Hanford) would exhibit similar behavior under the circumstances. In this respect, it is significant that witnesses testified that Mr. Hanford had a marked history of drug use and that police discovered burned aluminum foil on an accent table in the living room that was shaped as though it had been formed into a homemade pipe for smoking drugs. Officer James Swope also testified that six days after M.B.'s death, the individuals who were cleaning out the residence found a box containing drug paraphernalia in the room that had been Mr. Hanford's bedroom.

{¶25}  Mr. Hanford's neighbors also described an encounter with him that happened at approximately 2:00 a.m. on the date of M.B.'s death.  At that time, the neighbor testified that she heard a knock at the front door and opened it, believing that it might be a relative.  She recalled that Mr. Hanford wore a hoody over his head in a manner that concealed his features and testified that he pulled open the screen door, pushed passed her, and entered the house.  The neighbor testified that Mr. Hanford "didn't look like himself" and that "the whole situation was very odd; and all I remember are his eyes, they were kind of, like, very open, very wide."  The neighbor also noted Mr. Hanford's strange behavior: he sat down on their living room floor and removed his shoes; when she asked whether he knew that he was in their house, he apologized, complimented their choice of furniture, and left.  She recalled that Mr. Hanford was "very calm" during most of the encounter and did not appear to be upset or frightened.  He did not stumble or slur his speech, and he spoke clearly.  Her husband testified similarly, noting that Mr. Hanford's demeanor was unusual: "It was kind of like not there or not himself."  Mr. Hanford did not ask to use their phone, nor did he accept the couple's offer to call anyone on his behalf.

{¶26}  The physical evidence also contradicts Mr. Hanford's version of the events.  Dr. Sterbenz testified that within seconds of sustaining the fatal wound, M.B. would have been incapable of speech or any other directed action.  He noted that the injury sustained by M.B. results in almost instant incapacity marked by immediate collapse and agonal breathing.  Dr. Sterbenz also opined that a wound of this nature could not have been inflicted in the manner described by Mr. Hanford.  Both Dr. Sterbenz and Detective Donato testified that if M.B. had been upright and moving about the room in the seconds following the stabbing, the result would have been blood strewn about the crime scene rather than concentrated in the area immediately underneath M.B.'s body.  Instead, Dr. Sterbenz noted, it is far more likely that M.B. was sitting

or lying—or, at most, kneeling—near the position where his body came to rest at the time of the stabbing: "[M.B.] was stabbed right where we are seeing him. * * * He died right there. He bled right there."

{¶27} Having thoroughly reviewed the record, this Court cannot conclude that the jury lost its way by determining that Mr. Hanford's self-defense argument was without merit. His second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERR[]ED BY FAILING TO INSTRUCT THE JURY ON THE CRIME OF VOLUNTARY MANSLAUGHTER.

{¶28} Mr. Hanford's fourth assignment of error argues that the evidence at trial supported a jury instruction regarding voluntary manslaughter. Mr. Hanford did not request a voluntary manslaughter instruction at trial. For this reason, he has forfeited all but plain error in this respect. *See State v. Platt*, 9th Dist. Wayne No. 18835, 1998 WL 887220, *2 (Dec. 16, 1998). Because "'error * * * [is] the starting point for a plain-error inquiry,'" however, our analysis is the same. *State v. Doss*, 9th Dist. Wayne No. 18AP0027, 2019-Ohio-436, ¶ 4, quoting *State v. Hill*, 92 Ohio St.3d 191, 200 (2001); Crim.R. 52(B).

{¶29} A trial court must instruct the jury on lesser included offenses when "the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. Because the elements of voluntary manslaughter correspond to the elements of murder with the exception of one or more mitigating elements, it is an inferior degree of murder rather than a lesser included offense. *State v. Shane*, 63 Ohio St.3d 630, 632 (1992), quoting *State v. Tyler*, 50 Ohio St.3d 24, 36 (1990), quoting *State v. Deem*, 40 Ohio St.3d 205, 209 (1988) and. Nonetheless, the same test is applied, and a defendant is entitled to a jury

instruction on an offense of inferior degree when "the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Shane* at 632. The test is not merely whether a defendant produced "some evidence" that the elements of voluntary manslaughter are present, but whether "sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find the defendant guilty" of an inferior-degree offense. (Emphasis in original.) *Id*. at 632-633. In reaching this determination, this Court must consider the evidence in the light most favorable to the defendant. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 192, citing *State v. Campbell*, 69 Ohio St.3d 38, 47-48 (1994).

{¶30} R.C. 2903.03(A), which prohibits voluntary manslaughter, provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * * ." The offense of voluntary manslaughter requires an objective consideration of whether the provocation at issue is sufficient to arouse an ordinary person's passions beyond the power of his or her control. *Shane* at 634-635. If the provocation rises to that standard, a subjective inquiry into "the '* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time'" is required. *Id*., quoting *Deem* at paragraph five of the syllabus. To warrant a voluntary manslaughter instruction, the defendant must demonstrate that there is sufficient evidence going to both the objective and subjective elements. *See Shane* at 634.

{¶31} In this case, Mr. Hanford cannot demonstrate that the trial court erred by failing to give a voluntary manslaughter instruction because there is not sufficient evidence that the

subjective element of R.C. 2903.03(A) is present. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). *See also State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 157; *State v. Ivery*, 9th Dist. Summit No. 28551, 2018-Ohio-2177, ¶ 13-14; *State v. Thomas*, 9th Dist. Summit No. 27266, 2015-Ohio-2935, ¶ 29. When a defendant testifies that he caused the death of another because he feared for his own safety, that testimony is relevant to a claim of self-defense, but does not demonstrate the provocation necessary to establish the elements of voluntary manslaughter. *See Platt*, 1998 WL 887220, at *2.

{¶32} Mr. Hanford testified that he stabbed M.B. because he was afraid:

Q: At that exact moment, how did you feel?

A: That he was trying to hurt me.

Q: Were you afraid?

A: Yes, I was.

* * *

Q: So, you retrieved the knife, and then you had indicated you made some stabbing motions?

A: Yes.

Q: And why did you do that?

A: I was trying to get [M.B.] off of me.

Q: Because?

A: Because he was choking me. I was in fear for my life.

Mr. Hanford's only explanation for his actions was that he was motivated by fear. He did not offer any evidence suggesting that his mental state demonstrated the provocation required under R.C. 2903.03(A). Even when his testimony is viewed in the light most favorable to him, his fear alone is insufficient to establish the provocation element of voluntary manslaughter. *See*

*Thompson* at ¶ 157; *Mack* at 201; *Ivery* at ¶ 13-14; *Thomas* at ¶ 29. Without demonstrating that the elements of voluntary manslaughter were met, Mr. Hanford cannot, in turn, demonstrate that the trial court erred by failing to instruct the jury on voluntary manslaughter as a lesser-degree offense. *See Shane*, 63 Ohio St.3d at 632. In the absence of error, there can be no plain error. *See Hill*, 92 Ohio St.3d at 200.

**{¶33}** Mr. Hanford's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL[.]

**{¶34}** In his third assignment of error, Mr. Hanford has argued that his conviction should be reversed because trial counsel rendered ineffective assistance. Specifically, he has argued that trial counsel failed to request a jury instruction for voluntary manslaughter, failed to retain the services of an expert regarding Mr. Hanford's mental state during and after the murder, and failed to introduce Mr. Hanford's interview with Lieutenant Scarl to rehabilitate him following cross-examination. This Court disagrees.

**{¶35}** In order to demonstrate ineffective assistance of counsel, a defendant most show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. *Id*. at 694. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697. In applying this test, "a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland* at 689.

{¶36} With respect to Mr. Hanford's argument that trial counsel should have requested a jury instruction on the lesser-degree offense of voluntary manslaughter, that instruction was not warranted in this case, as discussed above. In other words, counsel's performance was not deficient, and it follows that it was not ineffective. *See State v. McDowell*, 9th Dist. Summit No. 26697, 2014-Ohio-3900, ¶ 18, citing *State v. Williams*, 9th Dist. Summit No. 25716, 2011-Ohio-6604, ¶ 14.

{¶37} Mr. Hanford also cannot establish ineffective assistance of counsel based on trial counsel's decisions not to retain the services of an expert witness or to introduce the video recording of Mr. Hanford's interview with Lieutenant Scarl. Trial counsel's decision not to call an expert witness will not, as a general rule, establish ineffective assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶118. In addition, when the trial record is silent regarding the substance of a potential expert's testimony, establishing prejudice under *Strickland* requires proof outside of the record, and "[the] claim is not appropriately considered on direct appeal." *Madrigal* at 390-391. *See also State v. Moffett*, 9th Dist. Summit No. 28001, 2016-Ohio-5314, ¶ 10. In this case, the record is silent regarding what testimony an expert may have offered about Mr. Hanford's mental state before and after the murder, so any arguments related to prejudice that could have resulted from counsel's decision are purely speculative. *See Conway* at ¶ 118. Mr. Hanford's third argument fails for a similar reason. Trial counsel attempted to introduce the video recording of the interview during cross-examination of Lieutenant Scarl, but counsel did not proffer the video at any time. Because the video is not in the record, this claim of ineffective assistance is not properly considered on direct appeal. *See Madrigal* at 390-391.

**{¶38}** Mr. Hanford has also argued that even if this Court finds that his three alleged instances of ineffective assistance do not warrant reversal on their own, their cumulative effect requires it. As explained above, there was no deficiency in counsel's performance with respect to Mr. Hanford's first argument, and his second and third arguments rely on evidence not contained within the record. Under these circumstances, we cannot find that cumulative error exists. *See State v. Jones*, 10th Dist. Franklin Nos. 18AP-33, 18AP-34, 2019-Ohio-2134, ¶ 76.

**{¶39}** Mr. Hanford's third assignment of error is overruled.

III.

**{¶40}** Mr. Hanford's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

        LYNNE S. CALLAHAN
        FOR THE COURT

TEODOSIO, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.