[Cite as *State v. Williams*, 2020-Ohio-3269.]

STATE OF OHIO        )                  IN THE COURT OF APPEALS
)ss:             NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

| | |
|---|---|
| STATE OF OHIO | C.A. No. 29444 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DEVON C. WILLIAMS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 18 12 4143 |

DECISION AND JOURNAL ENTRY

Dated: June 10, 2020

CALLAHAN, Presiding Judge.

{¶1} Appellant, Devon Williams, appeals his convictions by the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On the morning of November 20, 2018, Mr. Williams fired fourteen rounds from a firearm in the direction of a car parked near the door of a market on Arlington Street. When the shooting started, a passenger in the car fled on foot. Mr. Williams fired several shots in the passenger's direction as he ran away, then continued to fire at the driver of the vehicle. The driver, S.P., sustained gunshot wounds to his neck, torso, and leg, but attempted to flee by exiting the passenger side of the vehicle and running south on Arlington Street. Moments later, S.P. collapsed in the road, where he died from his injuries before the police arrived at the scene.

{¶3} Mr. Williams fired the shots from inside the market, and the market's surveillance cameras captured the shooting and the moments that led up to it on video. Outside surveillance

cameras at the market and other nearby businesses recorded the movements of other individuals who were involved in the incident, including the passenger, S.P., and other witnesses. Numerous witnesses placed 911 calls, but Mr. Williams fled the scene before the police arrived. A family member provided information that led to the identification of Mr. Williams as the shooter, and Mr. Williams turned himself in to police the following day.

{¶4} Mr. Williams was charged with one count of murder in violation of R.C. 2903.02(A), one count of murder in violation of R.C. 2903.02(B), two counts of felonious assault in violation of R.C. 2903.11(A)(2), and one count of attempted murder in violation of R.C. 2903.02(A)/(B) and R.C. 2923.02. Each of these charges was accompanied by a firearm specification pursuant to R.C. 2941.145(A). Mr. Williams was also charged with one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2)/(F)(1). Prior to trial, Mr. Williams moved the trial court to retroactively apply amendments to Ohio's self-defense statute, R.C. 2901.05(B). The State did not oppose the motion, and Mr. Williams testified during trial that he feared for his life because of three prior encounters with S.P. The trial court instructed the jury pursuant to the amended statute.

{¶5} The jury found Mr. Williams guilty of all charges and accompanying firearm specifications. The trial court merged counts one, two, and three with their firearm specifications and counts four and five with their firearm specifications, then sentenced Mr. Williams to prison terms totaling twenty-five years to life. Mr. Williams filed this appeal.

II.

**ASSIGNMENT OF ERROR**

APPELLANT DEVON C. WILLIAMS' CONVICTIONS WERE AGAINST THE
MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} In his single assignment of error, Mr. Williams argues that his convictions for murder, attempted murder, and felonious assault are against the manifest weight of the evidence. Specifically, Mr. Williams has argued that the conclusion that the State proved beyond a reasonable doubt that Mr. Williams did not act in self-defense is against the manifest weight of the evidence

{¶7} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶8} R.C. 2903.02(A), which prohibits murder, provides that "[n]o person shall purposely cause the death of another." R.C. 2903.02(B), which prohibits felony murder, provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2903.11(A)(2), which prohibits felonious assault, provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶9} Mr. Williams did not dispute that he fired the shots that resulted in S.P.'s death or that he fired shots in the direction of the passenger of S.P.'s vehicle as he fled on foot. Instead, Mr. Williams maintained that his actions were justified because he acted in self-defense. Self-

defense requires that a defendant "was not at fault in creating the situation giving rise to the affray; * * * [had] a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and * * * [did] not * * * violate[] any duty to retreat or avoid the danger." *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. An individual who is the first aggressor in an incident is "at fault" for purposes of self-defense. *State v. Turner*, 171 Ohio App.3d 82, 2007-Ohio-1346, ¶ 23 (2d Dist.), citing *Robbins* at 80-81. *See, e.g.*, *State v. Hanford*, 9th Dist. Summit No. 29204, 2019-Ohio-2987, ¶ 19-27.

{¶10} Each of these elements must be present to establish self-defense. *See State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 73, citing *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986). Until recently, self-defense was an affirmative defense that was required to be proven by a defendant by a preponderance of the evidence. *See Hanford* at ¶ 19, citing *State v. Martin*, 21 Ohio St.3d 91 (1986), syllabus, and former R.C. 2901.05(A). Recent amendments to R.C. 2901.05(B), however, reallocated the burden of proof with respect to self-defense:

> A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, *the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.*

(Emphasis added.) R.C. 2901.05(B)(1). Consequently, once there is evidence presented at trial that tends to support that the defendant acted in self-defense, the State must disprove one of the elements of self-defense beyond a reasonable doubt. *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31. *Compare Cassano* at ¶ 73 (noting that the elements of self-defense are framed cumulatively).

{¶11} In Ohio, there is an objective and a subjective aspect involved in determining whether a defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm: an individual's belief that he or she was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect. *See State v. Thomas*, 77 Ohio St.3d 323, 331 (1997). *See also State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 26-28; *State v. Huguley*, 9th Dist. Summit No. 28322, 2017-Ohio-8300, ¶ 35, quoting *State v. Inman*, 9th Dist. Medina No. 03CA0099-M, 2004-Ohio-1420, ¶ 9. Both aspects of this element require this Court to consider all of the surrounding circumstances. *Huguley* at ¶ 35, quoting *Inman* at ¶ 9.

{¶12} A defendant cannot introduce evidence of prior acts on the part of a victim to establish that the victim was the initial aggressor. *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-68, syllabus. With respect to whether the defendant had an honest subjective belief that he or she faced an imminent threat of harm, however, "[t]he defendant's state of mind is crucial[.]" *State v. Koss*, 49 Ohio St.3d 213, 215 (1990). Accordingly, "'[c]ourts have consistently held that a defendant arguing self-defense may testify about his knowledge of specific instances of the victim's prior conduct in order to establish the defendant's state of mind at the time of the incident.'" *In re D.N.*, 195 Ohio App.3d 552, 2011-Ohio-5494, ¶ 15 (8th Dist.), quoting *State v. Baker*, 88 Ohio App.3d 204, 208 (9th Dist.1993). Similarly, "[i]n determining whether there are reasonable grounds for believing there was an imminent threat of great bodily harm, [courts] can consider whether the defendant received prior threats." *Parma v. Treanor*, 8th Dist. Cuyahoga No. 106275, 2018-Ohio-3166, ¶ 25. When a defendant offers evidence of prior threats of violence, the gravamen of the evidence is the reason that the threats were made. *State v. Randle*, 69 Ohio App.2d 71, 73 (10th Dist.1980). Unless an explanation for the reason for prior threats is offered,

it is unlikely that they will establish reasonable grounds for believing that an imminent threat of harm existed. *See id.*

{¶13} Mr. Williams does not dispute that he fired the shots that killed S.P. or that, in the course of firing the gun, he turned and fired toward the passenger of S.P.'s car as he fled on foot. To this extent, there is no disagreement about the facts, many of which were captured on surveillance video from the scene. Officer Kevin Davis, who prepared a report that placed the surveillance footage in chronological order, testified at trial regarding the timeline that the footage establishes. At 10:01 a.m., Mr. Williams walked into the market with another man, later identified as R.H. A third man, later identified as B.S., was in the store conversing with the manager when Mr. Williams and R.H. entered. At 10:02:16 a.m., S.P.'s vehicle pulled into the parking lot of the market and parked just outside the entrance with the driver's side of the vehicle nearest the building. At that moment, Mr. Williams, B.S., and the store manager were having a conversation at the counter inside the market. From the surveillance video, it appears that Mr. Williams and B.S. immediately noticed that the car pulled up. Within five seconds, Mr. Williams—who was still standing at the counter—turned toward the entrance and drew his firearm. A smile was evident on his face as he drew the firearm. The surveillance video demonstrates that his firearm was drawn and ready to fire before he stepped away from the counter.

{¶14} According to the time stamp on the surveillance video, Mr. Williams reached the door to the market at 10:02:28 a.m., just twelve seconds after S.P.'s car turned off of Arlington Street into the parking lot. Only the front driver's side corner of S.P.'s vehicle was visible from the market entrance. The surveillance video depicts that without hesitation, Mr. Williams opened the market door with his left hand while raising his firearm with his right, aimed the firearm at the level of the driver's side window, and opened fire at 10:02:29 a.m. At 10:02:30 a.m., the other

individuals in the market reacted to the shots being fired by moving away from the counter toward the back of the market. Two seconds later, Mr. Williams pivoted to the left and opened fire on an individual who was moving away from the car. He immediately pivoted back to his original position and opened fire in the direction of S.P.'s vehicle again. At 10:02:36 a.m., Mr. Williams lowered his weapon, exited the market, and walked around the front corner of the building. Mr. Williams can be seen leaving the scene at 10:02:44 a.m. and running southbound along Arlington Street. As the videos demonstrate, the entire course of events played out in less than thirty seconds.

{¶15} Surveillance video taken from a position across the street from the market captured the movements of S.P. and his passenger as well. According to the time stamp on that video, S.P. stumbled from the open passenger side door of his vehicle at 10:02:33 a.m. He ran across Palmetto Avenue and along Arlington Street before collapsing in the southbound lane of traffic seconds later. This video also depicts Mr. Williams leaving the scene as S.P. collapsed in the roadway.

{¶16} Dr. Lisa Kohler, the Chief Medical Examiner for Summit County, testified that S.P. sustained three gunshot wounds, two of which were fatal. One entered the left base of his neck, "dislodged" in his trachea, and was aspirated into his airway, injuring S.P.'s trachea, carotid artery, and right lung as it traveled. A second bullet entered the area of his lower left ribcage, passing through his liver, pancreas, and lung and coming to rest in soft tissue. As a result of these injuries, over a quart of blood filled the pleural space of the right lung, aspirated blood entered the right lung, and some additional bleeding occurred in S.P.'s abdomen. Both of these injuries were fatal, but Dr. Kohler explained that because S.P. did not sustain a lethal brain injury, "it takes a while for the brain to realize that it doesn't have enough oxygen to keep the body going. And it's going to take a period of time for him to bleed out and get to a critical point where he can no longer

function." According to Dr. Kohler, this process explains S.P.'s ability to flee the scene of the shooting on foot, albeit briefly, until he succumbed to his injuries when he fell to the ground.

{¶17} R.H., who walked into the market with Mr. Williams, testified that he encountered Mr. Williams as he walked along Palmetto Avenue, asked him to purchase cigarettes in the market, then followed Mr. Williams inside. R.H. testified that once they entered the store, he walked toward the back to find a beverage and some chips. From that vantage point, he heard someone refer to S.P. by his last name, then saw Mr. Williams smile, draw a concealed weapon, and walk to the entrance. He heard someone say, "'You think this [is] a game?'" and then heard gunshots. R.H. moved to the back of the store because he feared being shot, then left the store and ran home.

{¶18} L.T. was the passenger in S.P.'s vehicle when he arrived at the market. He testified that he knew Mr. Williams from the neighborhood. L.T. acknowledged that he was on parole after serving two years in prison for a burglary conviction. On the day of the incident, S.P. called L.T. and told him that he was going to the store. L.T. testified that he accompanied S.P. to the market in a rental car and that the market was not the store that they ordinarily frequented. L.T. acknowledged that as S.P. drove, he recorded a cellphone video as he and S.P. listened to music. He also acknowledged that, as depicted in the video, S.P. had a gun in his lap as he drove. L.T. explained that some hand signs that are depicted in the video refer to firing a gun. He testified that when they arrived at the market, S.P. parked his car near the entrance. Although he did not know why S.P. parked there, L.T. explained that it was not unusual and noted that the lined spaces are on the other side of the building. L.T. testified that as the video ends, a gunshot can be heard. He explained that he was surprised and that he immediately opened the car door and fled on foot.

{¶19} L.T. acknowledged that he did not tell the police about the cellphone video or S.P.'s gun until they found out from another source. He also testified that he did not know that Mr.

Williams was there, that he had no issues with Mr. Williams, and that he and S.P. did not go to the store with the intention of shooting Mr. Williams. L.T. denied that he ever held S.P.'s gun in his hand.

{¶20} Z.H., the manager of the market, testified that he was working behind the counter on the morning of the incident. He noted that there were three individuals in the market at the time and recalled that they were talking to one another. He identified B.S. from a surveillance video as a frequent customer known as "Big B." He recognized Mr. Williams as a customer who came to the market "on and off." Z.H. did not know at the time who the victim of the shooting was, but he later recognized a picture of the victim as S.P., who came to the market "once in a while." He explained that it was not uncommon for people to park next to the door of the building as S.P. did, and that he only told them to move when he was outside the store to observe it.

{¶21} Lieutenant David Whiddon was one of the officers who responded to the scene of the shooting. He testified that it was "extremely difficult" to see into the market from outside. He also noted that based on his familiarity with the area, it was not unusual for patrons to park near the market door where S.P.'s vehicle was located. Lieutenant Whiddon testified that the Akron Police Department had no reports of contact between S.P. and Mr. Williams before the shooting, but acknowledged that B.S. provided information about previous contacts during the course of the investigation. Based on the evidence gained during the investigation, Lieutenant Whiddon testified that there was no indication that S.P. knew that Mr. Williams was inside the market or, conversely, that Mr. Williams knew that S.P. would be there.

{¶22} The gun depicted in L.T.'s cellphone video was found in S.P.'s vehicle after the shooting. According to a firearms expert from BCI, the gun had been illegally modified to render it fully automatic. Lieutenant Whiddon described the physical location of the gun after the

shooting. According to his testimony, the gun was found on the passenger side of the vehicle lodged between the passenger seat and the pillar—the portion of the car body that supports the roof between the front and back doors—as though it had been "stuffed in the vehicle with the handle * * * facing in the air." Lieutenant Whiddon testified that because of the placement of the gun, his initial assumption was that it belonged not to S.P., but to the passenger, L.T. Despite that assumption, L.T.'s DNA was not identified on the weapon, and Lieutenant Whiddon acknowledged that it was possible that S.P. placed the gun there as he exited the passenger side of the vehicle.

{¶23} Detective Donald Frost also described the physical location of the gun found in the car, noting that "the handgrip [was] up with the barrel facing the rear, so the butt of the gun was up towards the front and the end of the barrel where the bullet would come out from was facing towards the rear." He testified that he photographed the vehicle where it was found, but acknowledged that due to human error, the photographs had not been preserved. Detective Frost explained that most of the blood found in the vehicle was near the passenger side front door and there was not a significant amount on the driver's side door, on the floorboards, or on the center console. He noted that there was blood on the firearm when he found it. Detective Frost also testified that there were bullet holes spread across the vehicle, with at least seven in the driver's side door alone.

{¶24} Mr. Williams testified in his own defense. He explained that he grew up in the area of the shooting, but had since moved to Tallmadge, where he lived with his grandmother and his girlfriend. He explained that he returned to the neighborhood to visit because he had friends who still lived nearby. He also explained that he knew S.P. as they were growing up, but noted that he had conflict with S.P.'s friends.

{¶25} During his testimony, Mr. Williams pointed to three incidents in the year prior to the shooting that, according to him, led him to shoot S.P. in self-defense. The first incident that he described happened in the fall of 2017 when he attended a high school football game at the University of Akron. According to Mr. Williams, he saw S.P. and some of his friends laying on their car outside the stadium. He testified that as he and his companions approached, S.P. and his friends were "mean-mugging" him and that one muttered something under his breath. When Mr. Williams asked what the man said, the man threw a concession cup at him. Mr. Williams testified that a mutual confrontation resulted, during which he dropped his phone and S.P. picked it up. Mr. Williams testified that as he argued with S.P., he saw the handle of a gun in S.P.'s waistband. Mr. Williams testified that he backed away from the confrontation when he saw the gun, approached Akron police officers, and reported that S.P. had taken his phone. Mr. Williams recalled that he did not get the phone back, and he testified that in the days that followed, S.P. and his friends were answering his phone and telling people that he had "pulled up to the Rosemary," a neighborhood in conflict with the one in which Mr. Williams grew up.

{¶26} Mr. Williams testified that he had no further contact with S.P. until July 2018. At that time, he went to a drive-thru at a market in the Rosemary area with an acquaintance. Mr. Williams testified that he made eye contact with S.P., who was on foot, opened his car door, and heard S.P. threaten him. Mr. Williams stated that he did not see a gun on S.P.'s person, but he recalled that S.P.'s hand was positioned on his side as though he had a gun. S.P. left the business without incident.

{¶27} Mr. Williams explained that his final encounter with S.P. happened a month or two later when he was walking near the neighborhood where he grew up. At that time, he saw B.S. across a parking lot and walked over to join him. The two had a conversation, which Mr. Williams

characterized at trial as "stalling" on the part of B.S., then S.P. approached in a vehicle, parked, and "got all aggressive with [him]." Mr. Williams testified that S.P. pointed a gun at him, threatened him, pistol-whipped him, and robbed him. The two had no further interaction until the day of the shooting.

{¶28} Mr. Williams also described the events that took place on the day of the shooting. According to his account, he decided to go to the market to purchase cigars. He testified that he carried a gun for protection. Mr. Williams recalled that B.S., who was in the market when he arrived, saw S.P. pull up to the entrance and identified him. Mr. Williams testified that he did not recognize the car, but determined to "get ready because last time [S.P.] caught me slipping." He explained that he saw someone get out of the passenger door and walk toward the entrance to the market and assumed that "[t]hey was about to come out and kill me." He acknowledged that he opened the market door, aimed at S.P., and fired his gun, both at the vehicle and at L.T. as he fled on foot. Mr. Williams denied that he yelled, "You think this is all a game?" and he characterized his smile as an expression of nervousness or fear. He acknowledged that the driver's side door to S.P.'s vehicle was closed and the window was raised. Nonetheless, Mr. Williams testified that he made a "split-second decision" to fire the gun because he saw S.P. with a gun in his hand.

{¶29} The jury, therefore, heard Mr. Williams' testimony that he had three previous encounters over the course of a year with S.P. that were of a threatening nature, one of which was a mutual confrontation. The jury also heard his testimony that within a month or two prior to the shooting, S.P. physically attacked and threatened Mr. Williams. Mr. Williams testified that he was afraid and that, as a result, he avoided the area in which the shooting occurred. The prior incidents that he described were relevant to the extent that they provided insight into Mr. Williams' state of mind—whether he had a bona fide belief that he was in imminent danger of death or great bodily

harm. But, as noted above, Mr. Williams' belief that he was in imminent danger must have been objectively reasonable, and the evidence must indicate that he had an honest subjective belief to that effect. *See Thomas*, 77 Ohio St.3d at 331. *See also Brown*, 2020-Ohio-529, at ¶ 26-28; *Huguley*, 2017-Ohio-8300, at ¶ 35, quoting *Inman*, 2004-Ohio-1420, at ¶ 9. In other words, under R.C. 2901.05(B), the State may disprove self-defense by demonstrating that Mr. Williams' belief was not objectively reasonable or that he did not have an honest subjective belief that he faced imminent death or bodily harm. All of the evidence bears on these determinations. *See Huguley* at ¶ 35, quoting *Inman* at ¶ 9.

{¶30} In that regard, the jury watched numerous surveillance videos that documented the sequence of events in question, including the quick succession of events that led to S.P.'s death. Notably, that evidence demonstrated that Mr. Williams heard that S.P. was present in the car that pulled up, smiled, pulled and readied his weapon, and fired fourteen rounds all within a matter of seconds. Although Mr. Williams offered testimony that his facial expression was actually one of fear or nervousness, the jury was free to reach a different conclusion based on the videos' depictions of his facial expressions and demeanor in the seconds before he opened fire. The nature and timing of the prior interactions with S.P. that Mr. Williams described, which were remote in time to the shooting and for which Mr. Williams offered no rationale, could also have led the jury to conclude that any belief on his part that he was in imminent danger was not objectively reasonable. Further, although Mr. Williams suggested that the jury could draw an inference that S.P. knew that he was present in the store, this inference is undermined by the quick succession of events and by L.T.'s testimony that he and S.P. did not travel to the market to find Mr. Williams. Along the same lines, Detective Whiddon also testified that the investigation yielded no information that either Mr. Williams or S.P. knew that the other would be present.

**{¶31}** The jury could also have questioned whether Mr. Williams was at fault in the shooting. Specifically, the quick succession of events as depicted in the videos could call into question Mr. Williams' assertion that he stopped, crouched down at the door, and saw S.P. with a gun in his hand before he decided to open fire. It is also significant in this respect that the surveillance videos depict only the front corner of S.P.'s vehicle from the vantage point of the entrance.

**{¶32}** This Court must "'consider[] the credibility of witnesses'" as part of our manifest weight review. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Martin*, 20 Ohio App.3d at 175. Nonetheless, this Court is mindful of the well-established principle that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. Rivera*, 9th Dist. Lorain No. 18CA011263, 2019-Ohio-62, ¶ 39, quoting *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. *Compare Brown*, 2020-Ohio-529, at ¶ 23-31; *Hanford*, 2019-Ohio-2987, at ¶ 17-27 (both undertaking a manifest-weight analysis in the context of former R.C. 2901.05). Given the evidence in this case, this Court cannot conclude that this is the exceptional case in which the evidence weighs heavily against the conclusion that the State disproved the elements of self-defense.

**{¶33}** Mr. Williams' assignment of error is overruled.

III.

**{¶34}** Mr. Williams' assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.