[Cite as *State v. Brown*, 2020-Ohio-529.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

| STATE OF OHIO | | C.A. No.     19AP0004 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| EDWARD BROWN | | COURT OF COMMON PLEAS COUNTY OF WAYNE, OHIO |
| Appellant | | CASE No.     2018 CRC-I 000049 |

## DECISION AND JOURNAL ENTRY

Dated: February 18, 2020

TEODOSIO, Presiding Judge.

{¶1}     Appellant, Edward Brown, appeals from his felonious assault conviction in the Wayne County Court of Common Pleas.  We affirm.

I.

{¶2}     Mr. Brown and his long-time girlfriend ("H.H.") live at a house in West Salem, Ohio.  The couple also have a grown daughter ("A.B.") who had not been living with them. About one or two months before Christmas of 2017, however, Mr. Brown invited A.B. and her boyfriend ("M.M.") to live at the West Salem home, instead of continuing to live out of their cars and in motels during the cold winter.

{¶3}     Although two sharply conflicting stories were presented at trial as to the series of unfortunate events that unfolded at the home during Christmas that year, the parties agree that heated arguments between Mr. Brown and M.M. on the night of Christmas Eve led to both A.B. and M.M. being asked to pack up their belongings and leave the home the next morning.  While

A.B. and M.M. were in the process of packing and loading up their car, Mr. Brown and M.M. engaged each other in more arguing and yelling. Mr. Brown had a knife on his person and M.M. soon picked up a large furniture clamp during their verbal altercation. A.B. and H.H. both intervened at different times, but Mr. Brown ultimately stabbed M.M. in the back shoulder with his knife. A.B. and M.M. left the house and called 9-1-1.

{¶4} Mr. Brown was arrested and charged with felonious assault, a felony of the second degree. He was convicted after a jury trial, and trial court sentenced him to three years in prison.

{¶5} Mr. Brown now appeals from his conviction and raises one assignment of error for this Court's review.

II.

**ASSIGNMENT OF ERROR**

MR. BROWN'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} In his sole assignment of error, Mr. Brown argues that his felonious assault conviction is against the manifest weight of the evidence, as the jury lost its way when it rejected his affirmative defenses that he acted in self-defense and/or in defense of others. We disagree.

{¶7} This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a

'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶8} Mr. Brown was convicted of felonious assault, under R.C. 2903.11(A)(2), which states: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Physical harm to a person is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A "deadly weapon" is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). A knife, for example, constitutes a "deadly weapon" if it is possessed, carried, or used as a weapon. *State v. Horne*, 9th Dist. Summit No. 24348, 2009-Ohio-841, ¶ 10.

<u>M.M. and A.B.'s Version of Events</u>

{¶9} M.M. and A.B. testified similarly as to their recollection of the events in this case. M.M. testified that the couple moved in with A.B.'s parents about a month before Christmas in 2017. He testified that he was drinking scotch and playing video games for several hours on Christmas Eve while A.B. was away at work. A little after midnight, he heard incessant, vulgar screaming and yelling coming from the other bedroom. He heard Mr. Brown yelling, "F you" repeatedly at the top of his lungs. M.M. then heard a loud bang, like something hitting a wall,

followed by "an eerie dead silence." He called A.B. and asked if he should do anything, but she told him to stay out of it.

{¶10} M.M. testified that, around thirty minutes later, he went downstairs to the kitchen and heard more screaming from Mr. Brown along with more banging sounds. M.M. yelled upstairs, asking what was going on and if everything was okay. Mr. Brown yelled down, "[M]ind your own frickin, F-ing, business," which upset M.M. When M.M. said he was talking to H.H., and not Mr. Brown, it became a shouting match between all three individuals. M.M. testified that he was just trying to figure out if everyone was okay, but it escalated into Mr. Brown calling him a "f*****g pun[k]" and a "little b***h." He testified that, at some point, a vacuum cleaner or Shop-Vac was "hurled down the steps" at him and crashed into the wall on the staircase landing. M.M. testified that he then became "verbally combative" at this point and started calling Mr. Brown names. According to M.M., each man began challenging the other to either come upstairs or come downstairs to fight the other. M.M. testified that Mr. Brown descended partway down the stairs with a six-inch, serrated knife in his hand, so M.M. went up another staircase to his own bedroom and spoke to A.B. again on the phone.

{¶11} While on the phone with A.B., M.M. could hear Mr. Brown in the other room yelling, "I'm going to kill this M-Fer, * * * taking advantage of me * * *." A.B. also testified and confirmed multiple phone calls from M.M. that night. During the third call, she could hear "a lot of yelling" from both of her parents in the background. A.B. could hear H.H. attempting to be a "mediator," but by yelling at both men in a very crazy, loud, and boisterous manner. She could also hear who she believed was Mr. Brown, although she could not make out what he was saying. M.M. testified that he was concerned about falling asleep that night. The couple spoke on the phone for one-to-two hours, and M.M. eventually fell asleep.

{¶12} A.B. testified that she arrived home from work the next morning, and H.H. told her they had to leave. M.M. testified that A.B. woke him up and informed him that they had to leave, and that the sheriff's department would respond if they refused. The couple began packing up, with A.B. bringing items downstairs from their bedroom and M.M. loading them into their car. A.B. testified that she could hear Mr. Brown in the other room "getting upset" and starting to speak louder. M.M. also spoke to his own mother on the phone and secured a place for the couple to stay.

{¶13} According to M.M., when he came back inside after that phone call, Mr. Brown was standing five-to-six feet from the front door with his hand on his knife, although it was still in its leather sheath on his belt. More words were exchanged between the two men, and M.M. told Mr. Brown to back away with the knife because they were leaving. A.B. testified that M.M. said he was not comfortable carrying things outside if Mr. Brown was going to stand there trying to intimidate him. She testified that M.M. was asking Mr. Brown to move, but Mr. Brown was instead making "childish" comments like, "[T]his is my house" and "I can stand here." M.M. testified that Mr. Brown was shaking and smiling, his eyes looked "a bit wild," and he appeared "[u]nhinged." He testified that Mr. Brown was mumbling, but soon became more coherent and he was basically saying, "[Y]eah, M-Fer you're going to leave." According to M.M., Mr. Brown then moved closer to the door and kept making threats to goad him, such as, "You better leave or I'm going to hurt you * * * F-ing piece of s**t."

{¶14} M.M. testified that he felt in danger at that point, so he began verbally responding back to Mr. Brown in a combative way, attacking him personally as a father, as a man, and as a drug addict. However, he testified that he never made a move or advanced toward Mr. Brown, nor did he ever make any physical contact with, or put his hands on, Mr. Brown. M.M. testified

that A.B. was present for the argument and H.H. came downstairs shouting at them to leave while telling M.M. to calm down. M.M. offered to fight Mr. Brown if he would drop the knife. Mr. Brown instead approached M.M. and became more combative with the knife in his hand. Both M.M. and A.B. testified that Mr. Brown said, "I'm going to end you." M.M. testified that he picked up a big, heavy furniture clamp off the ground and took a combative stance to defend himself. H.H. stepped in between the two men, grabbed the clamp from M.M., and told him he was not going to break her stuff. A.B. also testified that H.H. grabbed the clamp, and M.M. let go of it. M.M. testified that he said, "screw it" at this point, and decided to leave.

{¶15} According to M.M., he turned around and took "maybe two steps" toward his suitcase when Mr. Brown ran up behind him and stabbed him in the back shoulder with the knife. He testified that it was "basically instantaneous." A.B. testified that M.M. turned around to leave and she saw Mr. Brown "go around [H.H.] and raise his arm back[,] and that's as quick as it happened." She saw Mr. Brown then move back a few paces, and M.M. said he had been stabbed. M.M. testified that he was going to attack Mr. Brown at this point, but A.B. jumped in between the two men and said if Mr. Brown was going to go after M.M. he would have to go through his own daughter. A.B. also testified that she got in between the two men and admitted to "screaming like a lunatic" because the situation was insane. A.B. testified that at no point did she ever advance toward anyone in an aggressive manner.

{¶16} M.M. testified that he called 9-1-1 and went outside with A.B. According to M.M., Mr. Brown came outside when he heard the sirens and continued taunting M.M., calling him a "snitching a** little b***h" for calling the police. A.B. testified that Mr. Brown emerged from the house with the knife before the "squad" arrived and was very loud, taunting M.M. with statements such as: "[L]et's finish this. I'm going to finish this * * *."

<u>Mr. Brown and H.H.'s Version of Events</u>

{¶17}  Mr. Brown and H.H. both testified at trial somewhat similarly to each other, but presented a very different version of events than that offered by M.M. and A.B.  The couple testified that they were both in their upstairs bedroom on Christmas Eve "joking around" by loudly saying "F you" to each other following a television commercial for an expensive car, which H.H. teased Mr. Brown he could buy for her for Christmas.  H.H. testified that there was no loud bang, as M.M. claimed during his testimony.  However, she was shown her handwritten statement to police on cross-examination, and admitted that she wrote "some stuff fell in the closet and made a hell of a bang."  H.H. testified that she only wrote about the loud bang because she was upset she would likely be losing her daughter over this incident.  The couple testified that M.M. soon yelled from downstairs and asked if everything was alright, and H.H. replied that everything was alright.  According to Mr. Brown, M.M. then demanded an apology from him "for hurting his feelings" and said Mr. Brown was going to apologize either before or after M.M. "whooped [his] a**."  H.H. testified that M.M. said he was owed an apology because Mr. Brown had disturbed his evening, but then said he was going to "kick [Mr. Brown's] a**" instead of accepting any apology.  H.H. testified that she went downstairs to calm M.M. down, and "[s]omehow the vacuum sweeper got knocked down [the stairs]."  She went downstairs three or four times to try to calm M.M. down, but he instead physically knocked her down twice.  H.H. admitted on cross-examination, however, that she did not include anything in her written statement to police that M.M. had shoved her down.  Mr. Brown testified that he shut the door to the landing at the bottom of the steps, but M.M. "flung it back open against the wall" and demanded a confrontation with him.  Mr. Brown testified that he responded by asking M.M. to "please stop."

{¶18} M.M. then ascended the other set of stairs in the house and, according to Mr. Brown, began hitting and trying to shove open another door to a bathroom which separated the two upstairs bedrooms. H.H. unlocked the door and tried to talk to M.M., but Mr. Brown testified that M.M. shoved her down multiple times. He further testified that, at H.H.'s behest, he did nothing in response to these assaults. According to him, M.M. continued to shove H.H. around and threaten the couple for the next three hours. Mr. Brown testified that M.M. said, "[T]wo pieces of s**t like [you] disappear ain't nobody going to care" and then further claimed he would kill Mr. Brown if he either kicked M.M. out of the house or called the police. M.M. also said he "wouldn't be happy unless he killed [Mr. Brown] or forced [Mr. Brown] to kill him" because "[M.M.'s] life was shit and he didn't care." Mr. Brown and H.H. both testified that this continued for a few hours until M.M. finally passed out and they heard him snoring. Mr. Brown admitted on cross-examination that, when he provided a written statement to the police, he failed to mention M.M. ever shoving H.H. down. He testified that he left certain things out of his written statement because he ran out of paper and the officer was "pissed off" he had already used three pages instead of one.

{¶19} Mr. Brown testified that he sat on a bench and guarded the stairs to his bedroom all night with his military knife while H.H. slept, as they were both scared for their lives. The next morning, the couple asked A.B. to get M.M. out of the house or they would call the sheriff's department. After a couple of hours, when the house seemed quiet, the couple believed A.B. and M.M. were finally gone. Mr. Brown went downstairs to check if they were gone and to get a drink. He testified that, through the kitchen window, he saw M.M. outside looking directly at him while talking on his phone. Mr. Brown attempted to go back upstairs, but M.M. "busted through the front door and was coming straight at [him]." H.H. testified that she looked out of

the upstairs bedroom window and could see M.M. outside, near the kitchen window, looking down at his phone. According to her, M.M. looked up and she saw "his eyes get real big" and he "all [of a] sudden [took] off to come running back into the house." Mr. Brown testified that he pulled out his knife, and M.M. "skidded to a halt," backed up about six feet, and kept taunting Mr. Brown. M.M. called Mr. Brown a coward and said, "Drop that weapon and I'm going to kill you with my bare hands like I promised you."

{¶20} The couple testified that H.H. soon came downstairs, and M.M. picked up a large furniture clamp. According to Mr. Brown, M.M. then said he was "going to finish killing [Mr. Brown's] b***h a** like he promised" and came toward him. H.H. jumped in between the two men and started wrestling or struggling with M.M. for possession of the clamp. H.H. testified that it was her clamp and she did not want "this kind of [b.s.] in [her] house." According to Mr. Brown, M.M. was crazy and psychotic, and he began "driving the clamp into [H.H.'s] eye in her temple area" and "tried to smash her in the face." H.H. also testified that "[she] knew it was going to get planted either in [her] eyeball or in [her] temple." According to H.H., M.M. had a violent look in his eyes and was smiling with a "sick grin like yeah, you're going to pay for this now[,]" as if he wanted to hurt her and "liked the idea." Mr. Brown testified that his only choice was to react quickly and stab M.M. in the shoulder with his knife to stop him. The couple testified that M.M. then used A.B. as a shield while continuing to taunt Mr. Brown. H.H. admitted on cross-examination, however, that she did not include this fact in her written statement because "it got forgotten" and the officer was "in a hurry" for her to finish her statement. Mr. Brown testified that while M.M. was holding A.B., he was urging Mr. Brown to stab A.B. as well.

{¶21}  A.B. and M.M. soon left the house and called 9-1-1.  Mr. Brown initially testified that he did not say anything else to M.M. after stabbing him, but he admitted on cross-examination—after being shown a deputy's body cam video—that he can be heard yelling something to M.M. as the deputy arrives at the scene.

<u>Self-Defense and Defense of Others</u>

{¶22}  Mr. Brown claimed self-defense and defense of others at trial, and now argues that the jury lost its way in rejecting these affirmative defenses.

{¶23}  Self-defense is an affirmative defense that, if proved, relieves a defendant of criminal liability for the force that he used.  *State v. Cornwell*, 9th Dist. Wayne No. 14AP0017, 2015-Ohio-4617, ¶ 19.  Similarly, "[p]ursuant to the defense of others doctrine, a person has a privilege to defend family members to the same extent he is entitled to protect himself."  *State v. Skinner*, 9th Dist. Lorain No. 06CA009023, 2007-Ohio-5601, ¶ 20.  We first note that because the offense in this matter occurred prior to March 28, 2019, former R.C. 2901.05(A) applied at the time of Mr. Brown's trial, and it was therefore his burden to prove, by a preponderance of the evidence, that he acted either in self-defense or in defense of others.  *See State v. Tyler*, 9th Dist. Summit No. 29225, 2019-Ohio-4661, ¶ 46.

{¶24}  To establish self-defense or defense of others, Mr. Brown had to prove the following elements:

> (1) that [he] was not at fault in creating the situation giving rise to the affray; (2) that [he] had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that [he] did not violate any duty to retreat or avoid the danger.

*State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).  The proper standard for determining whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a

question in the minds of reasonable jurors concerning the existence of such issue. *Skinner* at ¶ 18; *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. The elements of self-defense are cumulative, and if the defendant fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense or in defense of others. *Cornwell* at ¶ 19.

{¶25} As to the first element, Mr. Brown argues that neither he nor H.H. were at fault in creating the situation that gave rise to the affray. He argues that M.M.'s behavior built tension between the two men and, consequently, Mr. Brown feared for both his safety and for the safety of H.H. He further claims he was "not acting aggressively" on Christmas Day, but was instead "simply watching" A.B. and M.M. pack up their belongings. M.M., on the other hand, became responsible for the affray when he "[s]uddenly * * * burst inside the home, grabbed the furniture clamp, and charged straight toward Mr. Brown." M.M. also attempted to strike H.H. with the clamp when she tried to intervene.

{¶26} As to the second element, Mr. Brown argues that he had both an objective, reasonable belief of imminent danger as well as a subjective, honest belief that both he and H.H. were in danger of imminent harm. He contends that M.M. verbally harassed and threatened him and showed signs of physical aggression toward Mr. Brown and H.H. Mr. Brown relies on police officer testimony that M.M. "had a penchant for violent behavior" as well as M.M.'s own testimony that he had a "checkered past" to assert that it was objectively reasonable for Mr. Brown to believe both he and H.H. were in imminent danger when the man charging toward them with a furniture clamp had a "violent history" and had been recently aggressive and threatening. He argues that stabbing M.M. was the only way to stop the attack.

{¶27} As to the third element, Mr. Brown argues, and the State concedes, that he had no duty to retreat while lawfully in his own home. *See* R.C. 2901.09(B) (codifying the castle doctrine and stating "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense [or] defense of another * * *.").

{¶28} With respect to the first two elements of his affirmative defenses, however, conflicting testimony was presented as to whether Mr. Brown was the initial aggressor and whether he had a bona fide belief that either he or H.H. were in such imminent danger as to necessitate the stabbing of M.M. with a knife. "'[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.'" *State v. Haydon*, 9th Dist. Summit No. 27737, 2016-Ohio-4683, ¶ 28, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, when faced with two substantially different stories from four different people as to how the stabbing incident actually occurred, the jury was not required to believe Mr. Brown and H.H.'s version of events. *See State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 23.

{¶29} The jury's role was, in part, to determine and assess Mr. Brown and H.H.'s credibility. The State presented evidence at trial calling the couple's credibility into question. Mr. Brown and H.H. were both questioned on cross-examination as to why several facts they testified to at trial were never included in their written statements to police. For example, H.H. wrote in her statement that some stuff fell in the closet and made a "hell of a bang," yet she testified at trial that there was no loud bang. The couple also testified that M.M. had knocked H.H. down on multiple occasions on Christmas Eve, yet they both neglected to mention these physical assaults in their written statements to police. H.H. also testified that M.M. used A.B. as a shield while continuing to taunt Mr. Brown, yet this fact was left out of her written statement as

well. The jury was best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the proffered testimony. *See State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30. The jury chose to believe M.M. and A.B.'s version of events in this matter, and this Court has consistently held that "[w]e will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 13.

{¶30} Having reviewed the entire record, this Court cannot conclude that the jury lost its way when it rejected Mr. Brown's claims of self-defense and defense of others. In light of the evidence presented at trial, the jury could have reasonably concluded that Mr. Brown was either the initial aggressor or was at least not without fault in creating the confrontation when he rapidly approached M.M. and stabbed him in the back. *See Andrews* at ¶ 28. The jury could have also reasonably concluded that M.M. did not attempt to physically attack either Mr. Brown or H.H. and, therefore, Mr. Brown did not have a bona fide belief that either he or H.H. was in "imminent danger of death or great bodily harm." *See id.*

{¶31} Accordingly, after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot say that the jury, in resolving any conflicts in the evidence, clearly lost its way and created a manifest miscarriage of justice. *See Otten* at 340. Mr. Brown has also not demonstrated how this is an exceptional case where the evidence presented weighs heavily in his favor and against conviction. *See Thompkins* at 387.

{¶32} Mr. Brown's sole assignment of error is overruled.

III.

{¶33} Mr. Brown's sole assignment of error is overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

CHRISTOPHER S. COLERIDGE, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.