[Cite as *State v. Patton*, 2021-Ohio-1230.]

STATE OF OHIO      )           IN THE COURT OF APPEALS
                     )ss:      NINTH JUDICIAL DISTRICT
COUNTY OF WAYNE    )

STATE OF OHIO                     C.A. No.      19AP0028

    Appellee

    v.                             APPEAL FROM JUDGMENT
                                  ENTERED IN THE
KELLY PATTON                COURT OF COMMON PLEAS
                                  COUNTY OF WAYNE, OHIO
    Appellant               CASE No.     2018 CRC-I 000305

DECISION AND JOURNAL ENTRY

Dated: April 12, 2021

---

CARR, Judge.

{¶1}    Defendant-Appellant Kelly Patton appeals from the judgment of the Wayne County Court of Common Pleas. This Court affirms.

I.

{¶2}    On the morning of May 1, 2018, in the home they shared in Orrville, Patton stabbed her long-time boyfriend, the victim, multiple times. Patton's hand was also injured during the course of events. However, Patton and the victim described very different versions of events. There was no previous history of violence between the couple.

{¶3}    The victim maintained that he awoke to a pain in his neck. When he felt his neck, it was wet. After he asked Patton to turn the light on, which she did not do, his forearm was cut. The victim came to discover that Patton had a serrated knife. The victim was stabbed multiple times as he was attempting to flee the residence. The victim denied stabbing Patton. Ultimately, the victim was able to escape and a neighbor called 911.

{¶4} Patton presented a different version of events. She asserted that she awoke to a metal object being rubbed across her chest. The victim was straddling her, and she believed that he wanted her to have sex with him. She resisted and began struggling with him. At some point, she grabbed a knife from the victim and swung it at him; however, the victim was able to get the knife back. Patton felt a pain in her hand, and it went numb. She realized it was stuck to the mattress. She pulled her hand free, went to the bathroom, put her hand under running water, and took the knife out. She dropped the knife and wrapped her hand in a towel. A struggle ensued by the door, with the victim blocking Patton from leaving. Ultimately, Patton knocked the victim off balance, and they tumbled outside. Patton retreated back inside and locked the door.

{¶5} Patton was indicted on one count of attempted murder, two counts of felonious assault, and one count of domestic violence. The matter proceeded to a jury trial in February 2019, prior to the March 28, 2019 effective date of the current version of R.C. 2901.05(B), which describes how self-defense is established. At the close of the State's case, defense counsel moved for a judgment of acquittal as to the attempted murder count, which the trial court ultimately granted.

{¶6} Following the presentation of the defense case, the jury found Patton guilty of the remaining counts. In April 2019, defense counsel filed a motion for leave to file a motion for new trial. Defense counsel argued that had Patton's trial been scheduled for March 28, 2019 or after, she would have had the benefit of the amended version of the statute which provides that, when "there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense[.]" R.C. 2901.05(B)(1). The prior version required that the defendant establish the elements of self-defense by a preponderance of the evidence. *See State v.*

*Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10. The trial court denied the motion and sentenced Patton to an aggregate term of two years in prison.

{¶7} Patton has appealed, raising three assignments of error for our review.

II.

### ASSIGNMENT OF ERROR I

DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY HIS FAILURE TO RAISE THE ISSUE OF THE CHANGE IN LAW REGARDING SELF-DEFENSE AND ENSURING THAT [] MS. PATTON WAS ABLE TO BENEFIT FROM THE CHANGE.

{¶8} Patton argues in her first assignment of error that her trial counsel provided ineffective assistance of counsel by failing to raise the issue of the change in R.C. 2901.05(B) and by failing to ensure that Patton was able to benefit from the change. From Patton's brief, it is unclear what action she believes trial counsel should have taken on her behalf; however, we will presume that she is asserting that trial counsel should have requested a continuance of the trial to a date on or after the effective date of the amended statute.

{¶9} In order to prevail on a claim of ineffective assistance of counsel, Patton must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Patton must show that counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, Patton must demonstrate that but for counsel's errors, there is a reasonable probability that the

results of the trial would have been different. *Keith* at 534. This Court need not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶10} Debatable trial tactics do not give rise to a claim of ineffective assistance of counsel. *State v. Gannon*, 9th Dist. Medina No. 19CA0053-M, 2020-Ohio-3075, ¶ 25. "As with other trial matters, the decision whether to request a trial continuance is debatable, and involves a strategic choice of counsel that falls within the realm of trial strategy and tactics that will not ordinarily be disturbed on appeal." (Internal quotations and citations omitted.) *State v. Wynn*, 2d Dist. Montgomery No. 25097, 2014-Ohio-420, ¶ 90; *see also In re A.M.*, 9th Dist. Lorain No. 19CA011492, 2020-Ohio-3138, ¶ 28, citing *Wynn* at ¶ 90. Thus, Patton cannot demonstrate that her trial counsel's failure to request a continuance of the trial amounted to ineffective assistance of counsel. Notably, whether the continuance would have been granted, and, even if it had been, whether the trial court would have provided an instruction based upon the new statute is pure speculation. *Compare State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 23 (concluding that, when the offense at issue occurred prior to March 28, 2019, former R.C. 2901.05(A) applied, and it was the defendant's burden to prove, by a preponderance of the evidence, that he acted either in self-defense or in defense of others) *with Williams* at ¶ 4, 10-32 (applying the new statute to conduct that occurred prior to the effective date when the parties acquiesced to doing so).

{¶11} Accordingly, given the foregoing, as well as Patton's limited argument on appeal, we conclude that she has failed to demonstrate that trial counsel's performance was deficient. Thus, Patton has not demonstrated that she received ineffective assistance of trial counsel. *See Ray* at ¶ 10.

{¶12} Patton's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY FAILING TO DISMISS THE CASE DUE TO THE SUFFICIENCY OF THE EVIDENCE.

## ASSIGNMENT OF ERROR III

THE JURY'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Patton argues in her second assignment of error that the trial court erred in failing to dismiss all of the counts pursuant to Crim.R. 29(A) as there was insufficient evidence presented to support them because the victim's testimony lacked credibility. Patton argues in her third assignment of error that the jury's verdicts were against the manifest weight of the evidence. Essentially, Patton asserts that the victim's version of events was not believable. Patton does not appear to challenge any specific element of any of the offenses or argue that the weight of the evidence favors that Patton acted in self-defense. Our analysis will be limited accordingly. Because both assignments of error actually challenge the weight of the evidence, they will be addressed together. *See State v. McCormick*, 9th Dist. Summit No. 29121, 2019-Ohio-2204, ¶ 20 ("[T]he question of sufficiency does not concern itself with the resolution of evidentiary conflicts or credibility determinations.").

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶14} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and

disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶15} As mentioned above, the victim and Patton provided vastly differing accounts of the events. Given those differences, credibility determinations would have been particularly important in this matter.

{¶16} The victim met Patton at their mutual place of employment and the two began a relationship. They lived together for approximately eight years before the assault at issue. The couple had no history of violence. At the time of the assault, they were living together on McGill Street in Orrville and Patton's unemployment benefits were about to run out. Patton also had a life insurance policy for both herself and the victim that she paid the bill for. The policy was for $100,000.00 and Patton was the beneficiary on the policy.

{¶17} In April 2018, the victim made arrangements with a friend to buy a house in Wooster for the victim and Patton. That house needed work done, so the victim would frequently go over and work on the house. The victim expected Patton to move into the house with him, but Patton testified that she planned to find her own place. Around the time of the assault, Patton had asked the victim for help with paying some debts she owed; however, the victim indicated he was unable to help because he had already taken out a loan against his 401K to pay off some of her other debts. Patton had also made a statement that she owed the IRS $10,000.00; however, Patton denied that she owed the IRS any money.

{¶18} According to the victim, on April 30, 2018, the victim got home from work around 6:00 a.m., took a nap, and then went over to do some work on the house in Wooster. He stayed

there until around 9:00 p.m. before heading home to Orrville. The victim noticed that the TV was not on in the living room, where Patton usually slept. However, Patton was on the daybed in the living room. He went and took a shower, got something to eat, and then went to his room upstairs to watch TV. After midnight, the victim fell asleep.

{¶19} He awoke in the night to his back hurting. He shifted around and noticed that Patton was in bed with him, which was unusual. The victim dozed off and awoke when he felt pain in his neck. He coughed and gagged. He thought maybe Patton had turned over and hit him in the throat. He felt his neck and it felt wet. He asked Patton to turn the light on, telling her that he thought she might have cut him with her ring, and he wanted to see how bad it was. Patton said something about a nightmare and indicated she would turn a light on. She then told the victim that she would look and see how bad the cut was. The victim was then cut on his forearm. The victim could not see Patton and kept asking her to turn the light on. Patton did not turn the light on.

{¶20} As the victim was sliding out of bed towards the doorway, he heard Patton make an "oomph" sound and he was cut through his fingertip. The victim fled the bedroom and headed for the stairs. When he was on the first or second one, he heard Patton say that someone was in the house. She sounded panicked. It was light enough that the victim could see, and he told her there was not anyone in the house but them. Patton approached the banister and the victim reached up and grabbed Patton's hands, they struggled a bit, and the victim felt the serration of a blade. The victim shoved Patton against a wall and proceeded down the stairs.

{¶21} As he was trying to unlock the door, he felt a sharp pain below his shoulder blade and then another sharp pain near his butt. Patton ended up against the front door. The victim grabbed her, threw her across the room, and was able to make his way out the door. Patton followed him outside and kept telling him to come back inside so she could help him. Patton

followed the victim into the grass but then went back into the house. The victim did not notice Patton bleeding.

{¶22} The victim was going to head towards the gas station but was getting really cold and could feel blood pouring down his back. The victim noticed cars going by and so went into the middle of the road. He was clothed but did not have shoes on. The victim wore regular clothes to bed because he liked to be ready to go when he woke up.

{¶23} Around 5:40 a.m., a man was on his way to work when he noticed the victim wandering barefoot in the road. Concerned, the man called 911. The victim proceeded to the porch of a nearby house and rang the doorbell. A woman came to the door and saw the victim, who was holding his neck, bleeding, and asking for help. The woman described the victim as appearing panicked. The woman also called 911.

{¶24} Police and paramedics arrived. The victim informed police that Patton was still inside the residence. The victim was transported to a hospital for treatment of his injuries. He required stitches to his neck, the area below the shoulder blade, and near his butt.

{¶25} The victim acknowledged that his statement to police was somewhat different than his testimony; the victim did not inform the police of all the injuries that he testified to. In addition, the victim's testimony about where in the house his injuries occurred was sometimes different than what he told police. The victim explained that he only recalled the details later and that these statements were taken while he was still in the hospital.

{¶26} Officer Ryan Mace with the Orrville Police Department was dispatched to the scene. He found the victim on the porch on Park Street. The victim appeared shocked and confused. He was holding his neck and had several lacerations on his body. The victim then shared his version of events with the officer.

{¶27} Officer Mace proceeded to the victim's and Patton's home. At trial, a portion of Officer Mace's body camera video detailing his meeting with Patton was played; however, it was not admitted as an exhibit. Thus, it is not available for our consideration. Patton answered the door holding a towel covered in blood. She was very emotional. When she was asked to drop the towel, police discovered that she was bleeding from her hand. Patton asked police if they got "him" and told police that the victim left the house with a knife. Officer Mace then went back to see if the victim had a knife, but no knife was found on his person. Additionally, no knife was found outside. Patton informed police that no one else was in the house. Because suspected blood stains were found throughout the house, the Ohio Bureau of Criminal Investigation was brought in to process the crime scene. A serrated knife was found in the upstairs bathroom and a kitchen knife was found on the floor in a bedroom.

{¶28} When Officer Mace questioned the victim at the hospital, he denied stabbing Patton. After speaking with the victim at the hospital, Officer Mace went to where Patton was being treated to speak with her. Officer Mace described Patton as being very forgetful and unable to really put the events in chronological order. A portion of Officer Mace's body camera video from his interview with Patton at the hospital was also played at trial. This video was also not admitted at an exhibit and so is also not available for this Court's review.

{¶29} Sergeant Cory Seiler reported that he interviewed Patton at the police station and that she also provided a written statement. Patton gave confusing accounts of the events, despite appearing very calm. Even when asked to describe her relationship with the victim she said both that the victim was upset that they were probably going to break up and that they had never discussed separating. She had difficulty putting the events in chronological order and indicated that she did not remember a lot of things. She stated multiple times that she had memory issues.

She told police that the altercation began in the victim's bedroom while they were both in bed. Patton awoke to a metal object being rubbed across her chest. Patton told police that the victim wanted to have sex and Patton was resistant. She pushed the victim against the wall and the two struggled. She was not sure about when she obtained the knife or if or where she stabbed the victim. Patton initially did not remember where she was when she was stabbed in the hand and later indicated that it occurred while she was in bed. She then ran into the bathroom and pulled the knife out and wrapped her hand in a towel. Ultimately, the struggle proceeded downstairs. Patton told police that the victim was like a hockey player blocking the door. At one point, the victim became unbalanced and she was able to get him out of the house. Patton then locked the door.

{¶30} After talking with both the victim and Patton, Sergeant Seiler found the victim to be very consistent and Patton to be inconsistent; thus, he concluded that Patton was a suspect in the assault.

{¶31} Samuel Troyer, a forensic scientist with the forensic biology and DNA sections of the Ohio Bureau of Criminal Investigation, testified about the evidence that was analyzed from the crime scene. Four blood stains were identified on the serrated knife: one on the handle, one near the hinge, one along the back ridge, and one on the blade. In addition, a swab was taken from the unstained portion of the handle of the serrated knife. The DNA from three of the stains was consistent with the DNA standard from Patton. The victim was excluded as a contributor to those samples. The fourth stain, from the blade of the serrated knife was a mixture that included DNA consistent with both Patton's and the victim's. Patton's DNA was consistent with the major profile found on the unstained portion of the handle; while male DNA was present in that sample, it was present at too low of a level for comparison purposes.

{¶32} Blood stains were also found on the kitchen knife. The first was near the tip of the blade and the second was near the middle of the blade. The unstained handle was also swabbed. Patton's DNA was consistent with the DNA recovered from both stains found on the kitchen knife and the victim was excluded as a contributor to those stains. The handle of the kitchen knife contained a mixture that was consistent with both Patton's and the victim's DNA profile. Finally, a piece of the mattress with blood staining on it was also tested. Patton's DNA was consistent with that of the major contributor of the sample and the victim's DNA was consistent with that of the minor contributor of the sample.

{¶33} Blood stains from various areas of the house contained DNA with a profile consistent with that of Patton; the victim was excluded from being a contributor to those samples.

{¶34} Patton also testified in her defense. She testified that she had told the victim that she was not moving with him to the new house and maintained she had been packing totes in preparation for her move. She asserted she was going to look for employment, stay with a relative, and relocate to somewhere near the new job.

{¶35} On April 30, 2018, Patton planned to go to her mom's house overnight because her mom had a doctor's appointment the next day. However, she did not go that night because the victim asked her to stay. Patton testified that she went to bed after the victim. She fell asleep in the victim's bed and woke up when she felt something metal going across her chest. The victim was straddling her, and she thought he wanted to have sex. Patton yelled at the victim to get off her, but the victim became more aggressive. The victim was yelling and the two began to struggle. Patton was afraid of the victim because he had never acted like that before. At one point, Patton managed to get the knife and started swinging it. The victim was able to get the knife back and Patton felt a pain in her hand, and it went numb. She realized it was stuck to the mattress. She

pulled her hand free and saw the victim in the doorway. When she looked again, he was gone. Patton went to the bathroom and put her hand under running water and took the knife out. She dropped the knife and wrapped her hand in a towel.

{¶36} Patton went towards the steps and saw the victim on the stairs. The victim then pushed Patton. The victim went down the stairs and Patton did not follow. She hoped the victim was going to leave. Patton then went downstairs, and the victim came up behind her and threw her across the room. The victim was standing in front of the door blocking it. Eventually, Patton was able to knock the victim off balance and they tumbled outside. Patton hurried back inside and locked the door. She began looking for her phone but could not find it because it was dark. Patton rinsed her hand again in the kitchen sink and rewrapped it. Patton then went into the basement to flip the breakers. When she did so, the lights came on. Patton saw the victim outside and then saw flashing lights from police cars. Patton did not go meet the police because she was afraid the victim was still out there. Patton asserted that she was able to remember events better at the time of trial. Patton required two surgeries on her hand and it still was not completely normal at the time of trial.

{¶37} On appeal, Patton merely argues that the victim's version of events was incredible, thereby challenging the jury's credibility determinations. *See* App.R. 16(A)(7). However, "it is well-settled law that the trier of fact is in the best position to make credibility determinations when evaluating the evidence presented at trial." *State v. Norris*, 9th Dist. Summit No. 27630, 2016-Ohio-1526, ¶18. The jury was able to observe the victim and Patton testify, and presumably was able to view body camera video of Patton's encounters with police. Moreover, the jury heard officer testimony that Patton's statements to police were often confusing and inconsistent leading Patton to become a suspect. After a thorough and independent review of the record, we cannot

say that the jury lost its way in finding the victim's testimony more credible than Patton's. Patton has not demonstrated that the jury's verdicts were against the manifest weight of the evidence.

{¶38} Patton's second and third assignments of error are overruled.

III.

{¶39} Patton's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

CALLAHAN, P. J.
TEODOSIO, J.
CONCUR.


APPEARANCES:

DAVID V. GEDROCK, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.