[Cite as *State v. Alexander*, 2023-Ohio-3450.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

JEREMIAH LAMAR ALEXANDER

    Appellant

C.A. No.     30053

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 19 08 2929

DECISION AND JOURNAL ENTRY

Dated: September 27, 2023

HENSAL, Judge.

{¶1} Jeremiah Alexander appeals his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} On August 19, 2019, a group of young males decided to walk to Borders Drive-Thru at the intersection of Arlington Street and Rosemary Boulevard to buy some cigars. As they walked north on Dahlgren Drive toward Rosemary Boulevard, three of the four stopped to talk to a group of women; the fourth kept walking, putting some distance between himself and the others. The fourth man, D.N., turned onto Rosemary Boulevard and noticed another man walking toward him. The two greeted each other and "dapped up," or shook hands, then continued on their way. D.N. took several more steps then heard gunfire from behind him. He looked over his shoulder and, supposing that the man he had just encountered was shooting at the three friends from whom he had separated, prepared to flee. At that point, however, the man turned toward him and fired

again, shooting D.N. in the back. D.N. ran to the nearby drive-thru for assistance, and an employee called the police.

{¶3} Meanwhile, after they separated from D.N., the other three males—J.A., D.W., and "Fat Dad"—spoke with the women they met on the street and then continued walking north on Dahlgren Drive. They approached Rosemary Boulevard in an area where a seven-foot chain link fence separates the sidewalk from the adjacent property. D.W., the youngest in the group, was walking behind J.A. and Fat Dad. D.W. heard gunfire coming from his side, turned, and saw that J.A. had fallen to the ground. After J.A. fell, D.W. saw someone running up Rosemary Boulevard across the street and away from the drive-thru. D.W. left the area and went to his aunt's house so that she could call the police because he did not have a cell phone.

{¶4} Akron police responded to a call reporting that the victim of a shooting was at Borders Drive-Thru. They found D.N. on the floor of the drive-thru with a gunshot wound to his back. Initially, D.N. refused to tell the police who had shot him. As he became aware of the gravity of his injury, however, he identified the shooter as "JWOP." Police who responded to other calls regarding a shooting in the area of Dahlgren Drive and Rosemary Boulevard found a crowd gathering around the body of J.A., who had died before police arrived at the scene as a result of a gunshot wound to the head.

{¶5} Through a neighborhood source, police connected the name "JWOP" with Mr. Alexander, and D.N. identified him from a photograph as the shooter. Two days after the shootings, Mr. Alexander was arrested at his grandmother's home in Akron. During an interview with detectives, Mr. Alexander stated that he "opened fire" during the incident and, when asked whether anyone else had a weapon, replied that it looked like one of the other individuals had a gun.

{¶6}   Mr. Alexander was indicted for murder, felonious assault, and improperly discharging a firearm at or into a habitation.   Each charge was accompanied by a firearm specification.  Trial commenced on April 26, 2021.  Before the jury retired for deliberations, the trial court instructed the jury about the burden of proof in a case in which self-defense is at issue:

> The Defendant is allowed to use deadly force in self-defense.  The State must prove beyond a reasonable doubt that the Defendant did not use deadly force in self-defense.
>
> To prove that the Defendant did not use deadly force in self-defense, the State must prove beyond a reasonable doubt at least one of the following:
>
> The Defendant was at fault in creating the situation giving rise to the shooting of [J.A.]; or the Defendant did not have reasonable grounds to believe he was in imminent or immediate danger of death or great bodily harm; or the Defendant did not have an honest belief, even if mistaken, that he was in imminent or immediate danger of death or great bodily harm; or the Defendant violated a duty to retreat or escape to avoid the danger; or the Defendant did not use reasonable force.

Mr. Alexander did not object to the jury instruction.  The jury found him guilty of murder in violation of Revised Code Section 2903.02(B) and of felonious assault, both with firearm specifications.  The trial court sentenced him to a total stated prison term of twenty-one years to life.  Mr. Alexander appealed, raising six assignments of error for review.  His assignments of error are rearranged for ease of disposition.

II.

**ASSIGNMENT OF ERROR I**

> JEREMIAH ALEXANDER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN PROSECUTORS FAILED TO CORRECT FALSE AND MISLEADING BALLISTICS TESTIMONY FROM INVESTIGATING DETECTIVES, PLAINLY VIOLATING NAPUE V. ILLINOIS. CRIM.R. 52; FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

**{¶7}** In his first assignment of error, Mr. Alexander argues that his right to due process was violated because the State failed to correct false or misleading testimony about the type of shell casing found near J.A.'s body. This Court does not agree.

**{¶8}** A violation of due process occurs when the state obtains a conviction through the use of "deliberate deception of court and jury by the presentation of testimony known to be perjured." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). The same is true when the state does not solicit evidence that is false but "allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Both situations present a deprivation of due process akin to the type addressed in *Brady v. Maryland¸* 373 U.S. 83 (1963). *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Giglio v. United States*, 405 U.S. 150, 153-154 (1972). *See also State v. Brantley*, 9th Dist. Summit No. 29924, 2021-Ohio-4621, ¶ 7-9.

**{¶9}** "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). At its most fundamental level, a *Brady* violation involves "the discovery, *after trial*[,] of information which had been known to the prosecution but unknown to the defense." (Emphasis added.) *Agurs* at 103. Once the existence of a *Brady* violation related to false testimony is established, a new trial is required if there is "any reasonable likelihood" that the false testimony affected the judgment of the jury. *Giglio* at 154, quoting *Napue* at 271. *See also Agurs* at 103.

**{¶10}** The record in this case does not demonstrate that a due process violation, as articulated by *Napue* and *Brady*, occurred. During trial, the State introduced a diagram that depicted the placards marking where physical evidence was found at the scene of the shooting.

Placard 1 represented the location of J.A.'s body, which was found near the tree lawn on the west side of Dahlgren Drive. Placard 2 represented the position of a shell casing found near the intersection of Dahlgren Drive and Rosemary Boulevard, and Placard 3 represented the position of another shell casing found just to the north of Rosemary Boulevard near the same intersection. Placards 5 through 12 represented the locations of shell casings or spittle found sequentially in a pattern on and around Rosemary Boulevard across the span of approximately sixty feet. Placard 4, on the other hand, marked the position of a shell casing found across from J.A.'s body on the east side of Dahlgren Drive near its intersection with Chesapeake Drive.

{¶11} Detective Brent Dube identified the exhibits that contained the shell casings and bullet fragments found at the scene, noting that State's Exhibit 33 was a photograph a shell casing located near the curb at the intersection of Chesapeake Drive and Dahlgren Drive. He identified State's Exhibit 12 as "Five 9-millimeter shell casings, Placards 3, 4, 5." He then elaborated after looking at the evidence label affixed to the exhibit:

Q:      Let me bring it to you. There you go.

A:      Okay. Five 9-millimeters, Placard 3, Placard 4.

There was a 3B from Chesapeake.

Placard 5, 9-millimeter.

And these are labels, [*sic*] I don't think print everything you type in.

Q:      You say you do not believe they print everything you type in?

A:      No.

Q:      You believe you typed in more?

A:      Yes.

Q:      Okay, And actually, if you look, collected, there's a letter F with: Dot, dot, dot; is that a fair statement?

A:      Yes.

The evidence label affixed to State's Exhibit 12 reads, "Placard #4 Federal .380 shell casing from Chesapeake [Drive].  Casing expanded as if fired through larger caliber pistol."  Detective Daniel Gump also identified the evidence found at Placard 4 as a shell casing.  He testified that he believed the shell casings found at Placards 5-6 and 8-12 were all 9-millimeter, but he did not testify about the shell casing found at Placard 4.  Detective Gump also explained that when a semi-automatic firearm is fired, the casing is ejected close in position to where the gun is fired.  In that regard, he noted that "[y]ou can say that [a shooter was] fairly close to the casings."

{¶12}  After the State rested, the trial court inquired about State's Exhibit 12 while discussing the admission of exhibits:

THE COURT: * * *

So I have a question.  Exhibit No. 12, which is cartridge casings from a 9-millimeter and a .38.  * * *  So these are * * * refresh my recollection about the relevance of the .38.

THE STATE:      These are all casings that were recovered from the scene.

THE COURT: Okay.

THE STATE:      The .38, specifically, hasn't been discussed much throughout trial; but it was a casing recovered at the scene.

THE COURT:      So in other words, there was a casing recovered at the scene. And based upon the testimony of one of the detectives about how casings are located close to the firing, there is relevance in the sense that it goes to [the defense's] position that there was a weapon fired at Mr. Alexander.

THE DEFENSE:      Correct.

THE COURT: All right.  Thank you.

The trial court admitted State's Exhibit 12 without objection but determined at that time that like the rest of the physical evidence admitted, it would not go to the jury unless specifically requested.

The State objected to this ruling, but the trial court overruled the objection. At the close of all of the evidence, however, the trial court revisited this decision, concluding that State's Exhibit 12 "will go back with the rest - - all the exhibits."

{¶13} It is unclear whether, as Mr. Alexander maintains, there was a false statement about State's Exhibit 12 in the first instance. This Court notes that when viewed in context, it appears that Detective Dube's reference to "a 3B from Chesapeake" may be an error in transcription given that the evidence label from which he was reading refers to a ".380 shell casing from Chesapeake * * * ." Neither party moved to correct the record under Appellate Rule 9(E). Even if there was a misstatement, however, it occurred in the context of trial—when the defense had access to the evidence label affixed to State's Exhibit 12 and the ability to correct the misstatement. *See generally Agurs*, 427 U.S. at 103. *See also State v. Bethel*, 167 Ohio St.3d 362, 2022-Ohio-783, ¶ 26; *State v. Wickline*, 50 Ohio St.3d 114, 116 (1990); *State v. Jones*, 1st Dist. Hamilton No. C-180091, 2019-Ohio-4862, ¶ 57-61. Moreover, State's Exhibit 12, which correctly identified the shell casing found at Placard 4, was ultimately provided to the jury. Accordingly, Mr. Alexander has not demonstrated that a violation of his right to due process occurred. Mr. Alexander's first assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

> JEREMIAH ALEXANDER WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO SEVERAL OTHER INSTANCES OF PROSECUTORIAL MISCONDUCT THAT PLAINLY VIOLATED HIS CONSTITUTIONAL RIGHTS. CRIM.R. 52; FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION

{¶14} Mr. Alexander's second assignment of error recasts the argument in his first assignment of error as prosecutorial misconduct. *See State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-422, ¶ 228. As discussed above, the conduct to which Mr. Alexander directs this Court's

attention occurred in the context of the trial itself. Mr. Alexander did not object and, consequently, has forfeited all but plain error. *See*, *e.g.*, *State v. Curtiss*, 2d Dist. Montgomery No. 29006, 2022-Ohio-146, ¶ 150-161; *State v. Newman*, 8th Dist. Cuyahoga No. 107060, 2020-Ohio-658, ¶ 8, 15-17. Mr. Alexander also argues that instances of prosecutorial misconduct were present throughout the State's closing arguments. He did not object to the statements at issue, however, so these arguments are also limited to plain error. *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, ¶ 94, citing *State v. Slagle*, 65 Ohio St.3d 597, 604 (1992). Mr. Alexander, however, has not provided this Court with a plain error argument, and this Court declines to construct one on his behalf. *See State v. Fortune*, 9th Dist. Wayne No. 19AP0024, 2020-Ohio-3606, ¶ 40. Mr. Alexander's second assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

> JEREMIAH ALEXANDER'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. FIFTH AND FOURTEENTH AMENDMENTS, U.S. CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION.

**{¶15}** Mr. Alexander's fourth assignment of error argues that his convictions were against the manifest weight of the evidence when considered without reference to the "Stand Your Ground" amendment to Section 2901.09 because the State failed to disprove that he acted in self-defense. This Court does not agree.

**{¶16}** When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction.  *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  A manifest weight challenge is the appropriate means of determining whether the State disproved that a defendant acted in self-defense under Section 2901.05(A).  *State v. Messenger*, __ Ohio St.3d __, 2022-Ohio-4562, ¶ 27.  *See generally State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring) ("[I]n deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion.).

{¶17}  Section 2905.01(B) places the burden of persuasion to disprove a claim of self-defense on the State.  *Messenger* at 26-27.  This requirement "does not in itself cause the affirmative defense to become an element of the offense[ ]" and "[s]elf-defense remains an affirmative defense in Ohio[.]"  *Id.* at ¶ 24.  The elements of self-defense are:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Id.* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).  Each element of self-defense must be present.  *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 73, citing *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).  Conversely, "[t]he state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden."  *State v. Rengert*, 5th Dist. Delaware No. 19 CAA 10 0056, 2021-Ohio-2561,  ¶ 33.  *See also State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶  10.

{¶18}  With respect to the third element of self-defense, Section 2901.09 was amended effective April 6, 2021, to provide that "a person has no duty to retreat before using force in self-

defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B). This amendment permits "Ohio citizens * * * to 'stand his or her ground' and defend themselves." *State v. Robinette*, 5th Dist. Stark No. 2021 CA 00124, 2023-Ohio-5, ¶ 51. For purposes of his fourth assignment of error, Mr. Alexander maintains that his convictions are against the manifest weight of the evidence even if the stand-your-ground amendment did not apply. Because the conclusion that the State disproved an element of self-defense other than the duty to retreat is not against the manifest weight of the evidence, this Court disagrees.

{¶19} This Court recently summarized the considerations at issue when determining whether a defendant "[had] a bona fide belief that he was in imminent danger of death or great bodily harm[.]" *Williams* at ¶ 9, quoting *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. This Court explained:

> In Ohio, there is an objective and a subjective aspect involved in determining whether a defendant had a bone fide belief that he or she was in imminent danger of death or great bodily harm: an individual's belief that he or she was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect. *See State v. Thomas*, 77 Ohio St.3d 323, 331 (1997). *See also State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 26-28; *State v. Huguley*, 9th Dist. Summit No. 28322, 2017-Ohio-8300, ¶ 35, quoting *State v. Inman*, 9th Dist. Medina No. 03CA0099-M, 2004-Ohio-1420, ¶ 9. Both aspects of this element require this Court to consider all of the surrounding circumstances. *Huguley* at ¶ 35, quoting *Inman* at ¶ 9.
>
> A defendant cannot introduce evidence of prior acts on the part of a victim to establish that the victim was the initial aggressor. *State v. Barnes*, 94 Ohio St.3d 21, 2002-Ohio-68, syllabus. With respect to whether the defendant had an honest subjective belief that he or she faced an imminent threat of harm, however, "[t]he defendant's state of mind is crucial[.]" *State v. Koss*, 49 Ohio St.3d 213, 215 (1990). Accordingly, "'[c]ourts have consistently held that a defendant arguing self-defense may testify about his knowledge of specific instances of the victim's prior conduct in order to establish the defendant's state of mind at the time of the incident.'" *In re D.N.*, 195 Ohio App.3d 552, 2011-Ohio-5494, ¶ 15 (8th Dist.), quoting *State v. Baker*, 88 Ohio App.3d 204, 208 (9th Dist.1993). Similarly, "[i]n determining whether there are reasonable grounds for believing there was an imminent threat of great bodily harm, [courts] can consider whether the defendant received prior threats." *Parma v. Treanor*, 8th Dist. Cuyahoga No. 106275, 2018-

Ohio-3166, ¶ 25. When a defendant offers evidence of prior threats of violence, the gravamen of the evidence is the reason that the threats were made. *State v. Randle*, 69 Ohio App.2d 71, 73 (10th Dist.1980). Unless an explanation for the reason for prior threats is offered, it is unlikely that they will establish reasonable grounds for believing that an imminent threat of harm existed. *See id.*

*Id.* at ¶ 11-12. Mr. Alexander does not dispute that he fired the shot that killed J.A. or that he turned and fired on D.N. as D.N. fled. He maintains, as he did at trial, that he did so in self-defense.

{¶20} D.N. testified that on the evening of the shooting, he walked with J.A., D.W., and Fat Dad toward the drive-thru at the corner of Rosemary Boulevard and Arlington Street so that they could purchase cigars. D.N. acknowledged that they had smoked marijuana that day, but he denied that he had consumed any alcohol. He testified that he did not have a weapon and maintained that he had not seen anyone in his group of friends with a weapon that day. All but D.W., however, carried cellular phones. He testified that the group started walking on Dahlgren Drive toward Rosemary Boulevard together, but that he continued alone when J.A., D.W., and Fat Dad stopped to talk to some women. At that point, D.N. was ahead of the group so that he turned left onto Rosemary Boulevard while the other three were still walking on Dahlgren Drive in an area where a tall chain link fence separated the sidewalk from an apartment complex at the corner.

{¶21} D.N. testified that as he walked toward Arlington Street on Rosemary Boulevard, he encountered Mr. Alexander walking toward him. D.N. knew of Mr. Alexander; he explained that although Mr. Alexander and J.A. had "history," there was no animosity between the two of them. He testified that he and Mr. Alexander approached each other on the sidewalk without any aggression, greeted each other, shook hands, and continued walking in opposite directions. According to D.N., the encounter—which lasted about ten seconds—was "cordial." D.N. testified that after he took eight or nine more steps, however, the situation changed quickly: he heard multiple gunshots and looked over his shoulder to see Mr. Alexander shooting in the direction of

the other three men, who were still around the corner on Dahlgren Drive. D.N. testified that he had started to flee when Mr. Alexander shot him in the back.

{¶22} Although D.N. emphasized that he and Mr. Alexander did not have any animosity toward each other, he acknowledged that they were part of different social groups that had a contentious history. D.N. recalled that his group of acquaintances and Mr. Alexander's group of acquaintances had been in a fight a few days before the shooting. Given Mr. Alexander's history of tension with J.A., D.N. testified that he "just felt like something was about to happen[]" before the shooting occurred. D.N. acknowledged that the level of tension between the two groups was such that they might start fighting or fire at each other upon sight and speculated that Mr. Alexander "maybe felt like he was getting setup, something like that[.]"[1]

{¶23} Nonetheless, D.N. explained that the other three men were walking in a position diagonal from Mr. Alexander and were separated from him by a chain link fence that blocked their ability to approach each other without going around it. He testified that Mr. Alexander "stopped walking and just started shooting straight through the fence." After D.N. was shot, he fled to the drive-thru, where employees pulled him inside and called the police. Although he initially refused to identify the person who shot him, D.N. identified Mr. Alexander by his street name as his condition deteriorated.

{¶24} D.W., who was fourteen on the date of the shooting, was one of the two individuals who walked with J.A. toward the corner of Rosemary Boulevard and Dahlgren Drive. D.W. noted that the group was 30-35 feet from D.N., who was walking on Rosemary Boulevard, and D.W. testified that he had been walking behind J.A. and Fat Dad as the group approached the

---

[1] According to Mr. Alexander, D.N. testified that he "could see how [Mr. Alexander] would feel that he was being 'setup.'" D.N. did not make this statement during trial, and Officer Schwarting also denied that D.N. made such a statement to him.

intersection. D.W. recalled that J.A. was using his cellular phone as they walked. According to D.W., he looked to the right at a passing car then heard gunshots from the left. D.W. testified that he looked back in that direction and saw J.A. had fallen to the ground. After J.A. was shot, D.W. saw someone running up Rosemary Boulevard away from the drive-thru. D.W. testified that no one in his group had a gun and that, from his perspective, they had done nothing to provoke the shooting. He also observed that no one fired at the shooter. D.W. was aware of a fight between the two groups of acquaintances, but he testified that he did not participate and that J.A. had not been involved.

{¶25} Detective Brent Dube described the evidence found at the scene of the shooting. J.A.'s body was found in the tree lawn on the west side of Dahlgren Drive. According to Detective Dube's testimony, there were numerous shell casings found in an east-west pattern on and around Rosemary Boulevard across the span of approximately sixty feet near the intersection with Dahlgren Drive. All of these shell casings were from 9-millimeter bullets. A single shell casing from a .38 caliber weapon was found on the side of the street opposite J.A.'s body near the intersection of Dahlgren Drive and Chesapeake Drive. According to another detective, a bag containing 9-millimeter bullets was found with Mr. Alexander's personal effects when he was arrested. Three detectives testified that the area of Rosemary Boulevard and Dahlgren Drive is one with a high rate of crime, including many reports of gunshots. Detective Richard Doney testified that no weapon was found on or around the location of J.A.'s body.

{¶26} Mr. Alexander testified in his own defense. He explained that his acquaintance with J.A. dated to approximately 2016, before Mr. Alexander moved out of the Rosemary Boulevard neighborhood to the west side of Akron. According to Mr. Alexander, the two did not renew their relationship when he moved back to the area, and he believed that J.A. was no longer

friendly toward him. Mr. Alexander testified that at some point after he moved back, he learned that a friend of his was believed to have something to do with the death of one of J.A.'s friends. He characterized his contact with J.A. from that point forward as violent. According to Mr. Alexander, J.A. shot from a moving vehicle toward a parking lot where he was hanging out with some friends approximately one month before this incident. A week or two later, he testified, someone else fired at him from the same car. Mr. Alexander also recalled that his own car had been "shot up" on or around August 1, 2019. He attributed the shooting to J.A. and testified that afterward, he purchased a 9-millimeter handgun off the street. He agreed that gunfire is common in his neighborhood.

{¶27} R.J., Mr. Alexander's cousin, testified that he was with Mr. Alexander when someone shot at his car. According to R.J.'s testimony, it was dark outside, and he did not see the shooter. R.J. testified that Mr. Alexander was "kind of nervous" right after his car was shot, but the two did not spend enough time together for him to observe Mr. Alexander's demeanor in the days that followed. R.J. also acknowledged that he had been communicating with Mr. Alexander throughout the criminal proceedings and that he did not want Mr. Alexander to go to jail, although he denied that he would lie for his cousin.

{¶28} Mr. Alexander testified that on the date of the shooting, he decided to walk to Borders Drive-Thru to buy some Black & Milds. He carried his weapon because of the "rough neighborhood" and because someone had shot at him on a previous occasion. Mr. Alexander testified that as he walked home along Rosemary Boulevard, he encountered someone that he recognized as an acquaintance of J.A. but whose name he did not know. The two men greeted each other, but his account differed from D.N.'s in that he characterized D.N.'s tone of voice as a "[l]ittle bit aggressive." According to Mr. Alexander, he then saw three individuals approaching

Rosemary Boulevard from Dahlgren Drive. He testified that he could make out J.A. and D.W. from the illumination provided by a streetlight. Two of the individuals were "clutching"—walking with their hands in the pockets as if to hold something. Mr. Alexander explained that "clutching" could involve "anything, could be a firearm, could be a knife. That's what we call clutch and go." He testified that as soon as he saw that the third individual had what he believed to be a gun, he pulled his own and opened fire. Mr. Alexander identified that individual as J.A., and he clarified that although he believed J.A. was holding a firearm, it was not pointed in his direction. Mr. Alexander admitted that he fired the first shot, and he testified that shots were fired from the area of the three men at some point. Mr. Alexander further acknowledged that he also shot D.N., whom he had passed moments before, as D.N. was fleeing in the opposite direction. Mr. Alexander testified that he was afraid, that the events played out in a matter of seconds, and that he ran from the scene, discarding his gun in a grassy area. He testified that shots were being fired in his direction while he ran.

{¶29} Mr. Alexander also acknowledged discrepancies between his testimony and his previous statements. He did not tell the police during his interview shortly after the shooting that it was J.A. who shot at his car, and he denied at that time that anyone was with him during that incident. During that interview, Mr. Alexander also emphasized that it was dark on the night that he shot J.A. and D.N. and he did not know the individuals that he saw—including J.A. He did not mention that he saw a gun before he opened fire until prompted by a question from the detective who interviewed him.

{¶30} Detective Dube and Detective Daniel Gump described the physical evidence that was found at the scene of the shooting. As described above, Placard 1 represented the location of J.A.'s body on the west side of Dahlgren Drive. Placard 2 represented the position of a shell casing

found near the intersection of Dahlgren Drive and Rosemary Boulevard, and Placard 3 represented the position of another shell casing found just to the north of Rosemary Boulevard near the same intersection. Placards 5 through 12 represented the location of shell casings or spittle found in a pattern on and around Rosemary Boulevard across the span of approximately sixty feet that corresponded to the path that Mr. Alexander took as he fled. A 9-millimeter bullet slug was also recovered from a residence on Dahlgren Drive near J.A.'s body. All of these shell casings were from 9-millimeter ammunition. Placard 4 represented the position of a single shell casing located across the street from J.A.'s body on the east side of Dahlgren Drive near where it intersects Chesapeake Drive. That shell casing was fired from a .38 caliber firearm.

{¶31} Detective Gump, who works with the Crime Scene Unit of the Akron Police Department, explained that shell casings are ejected from a semi-automatic firearm near where the gun is fired, although he acknowledged that it is not possible to identify precisely where a shooter stood. The pattern of the 9-millimeter shell casings that were recovered corresponded generally with Mr. Alexander's path of flight. Mr. Alexander acknowledged that his gun was a 9-millimeter, and he was in possession of ammunition for that gun was he was arrested. Neither Mr. Alexander's weapon nor any other weapon related to the shooting was ever recovered, and there was no testimony that specifically connected either the .38 caliber shell casing or the bullet slug recovered from a nearby residence to this incident.

{¶32} The jury in this case heard testimony from Mr. Alexander regarding three prior encounters with J.A. The jury also heard Mr. Alexander's testimony that he was afraid as a result of these incidents and that he purchased a weapon in response. These incidents were relevant to the jury's consideration of whether Mr. Alexander had a bone fide belief that he was in imminent danger of death or great bodily harm. *See Williams*, 2020-Ohio-3269, at ¶ 29. As noted above,

however, he must have had an honest subjective belief to that effect *and* that belief must have been objectively reasonable. *See id.* In that regard, with respect to one of the prior incidents, Mr. Alexander's statements conflicted with the testimony of R.J., who testified that it was too dark to identify the person who shot at Mr. Alexander's vehicle during the previous incident. With respect to another of the incidents, it appears from Mr. Alexander's testimony that while J.A. was present, he was not the aggressor. Mr. Alexander also acknowledged that he initially told the police that on the night of the shooting, he was uncertain whether J.A. was one of the individuals walking toward him before he opened fire.

{¶33} The jury could also have questioned whether Mr. Alexander was "at fault" in the shooting. *Compare Williams* at ¶ 31. Mr. Alexander never denied that he shot first, and he acknowledged that he turned and shot D.N. in the back as D.N. attempted to flee. Although he maintained at trial that he saw a gun in J.A.'s possession before he opened fire, Mr. Alexander's statement to police was more qualified: he did not mention that anyone else had a weapon until the detective brought it up, and he explained that because it was dark, the identity of the three individuals was unclear. In that regard, other witnesses testified that there was limited lighting in the area where the shooting occurred and described, in general terms, the distance between Mr. Alexander and the group of men and the tall chain-link fence that stood between them. D.W., for example, testified that immediately before the shooting, he could not see D.N. around the corner. Both D.N. and D.W. denied that anyone in their group had a gun on his person. With respect to the encounter with D.N. that immediately preceded the shooting, Mr. Alexander testified that D.N.'s tone when they exchanged greetings on the night of the incident was aggressive, but the jury also heard D.N.'s testimony that their interaction was cordial and not characterized by any aggression.

{¶34} This Court must "'consider[] the credibility of witnesses'" as part of our manifest weight review. *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175. Nonetheless, this Court is mindful of the well-established principle that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Given the evidence in this case, this Court cannot conclude that this is the exceptional case in which the evidence weighs heavily against the conclusion that the State disproved that Mr. Alexander had a bone fide belief that he was in imminent danger of death or great bodily harm or that he was not at fault in creating the situation that gave rise to the incident. *See Robbins*, 58 Ohio St.2d 74 at paragraph two of the syllabus. Mr. Alexander's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY TO CONSIDER WHETHER JEREMIAH ALEXANDER VIOLATED A DUTY TO RETREAT FOR PURPOSES OF SELF-DEFENSE. CRIM.R. 52; FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION

{¶35} In his third assignment of error, Mr. Alexander argues that the trial court erred by instructing the jury in accordance with the law of self-defense as it existed before April 6, 2021. Mr. Alexander acknowledges that he did not object to the jury instruction and urges this Court to recognize plain error. *See State v. McManaway*, 9th Dist. Wayne No. 20AP0046, 2022-Ohio-2086, ¶ 20.

{¶36} Criminal Rule 52(B) permits this Court to notice plain errors or defects that affected a substantial right in the absence of an objection in the trial court. Under Rule 52(B), "the *defendant* bears the burden of demonstrating that a plain error affected his substantial rights." (Emphasis in original.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 14. *See also State*

*v. LaRosa*, 165 Ohio St.3d 346, 2021-Ohio-4060, ¶ 40. This Court can only notice plain error when there has been a deviation from a legal rule that constitutes an obvious defect in the trial proceedings that affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). We do so only in exceptional circumstances to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶37} Mr. Alexander submitted proposed jury instructions that included a self-defense instruction without reference to amended Section 2901.09. After addressing the burden of proof during a conference on the record to discuss the proposed jury instructions, the trial court instructed the jury with reference to the burden of proof contained in R.C. 2901.05(A). With respect to the duty to retreat, however, the trial court instructed the jury:

> The Defendant had a duty to retreat if he was at fault in creating the situation giving rise to the altercation or did not have reasonable grounds to believe and had an honest belief that he had a reasonable means of escape from that danger other than by the use of deadly force.

Mr. Alexander did not object to this instruction.

{¶38} Even if Mr. Alexander demonstrated that the trial court erred by failing to instruct the jury under amended Section 2901.09, he has not established that the result of the proceeding would have been different. A defendant who asserts self-defense must produce evidence demonstrating three things: that the defendant "'was not at fault in creating the situation giving rise to the affray; * * * [had] a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and * * * [did] not * * * violate[] any duty to retreat or avoid the danger.'" *Williams*, 2020-Ohio-3269, at ¶ 9, quoting *Robbins*, 58 Ohio St.2d 74 at paragraph two of the syllabus. *See generally Messenger*, __ Ohio St.3d __, 2022-Ohio-4562, at ¶ 21. Because each of these elements must be present, the State's burden of persuasion is satisfied by disproving any one of them. *Rengert*,

2021-Ohio-2561, at ¶ 33.  *See generally Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, at ¶ 73, citing *Jackson*, 22 Ohio St.3d at 284.  As discussed in this Court's resolution of Mr. Alexander's fourth assignment of error, the evidence demonstrates that the State met its burden of persuasion with respect to at least one of the elements of self-defense.  Mr. Alexander has not demonstrated that a different outcome would have resulted with respect to those elements had the trial court applied Section 2901.09 as amended.  His third assignment of error is overruled on that basis.

## ASSIGNMENT OF ERROR V

> JEREMIAH ALEXANDER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; AND ARTICLE I, SECTIONS 1 AND 16 OF THE OHIO CONSTITUTION.

**{¶39}**  In his fifth assignment of error, Mr. Alexander argues that he did not receive effective assistance of trial counsel.  Specifically, he maintains that trial counsel's performance was ineffective because he failed to object to jury instructions that did not incorporate the amendment to Section 2901.09, effective April 6, 2021, which eliminated the duty to retreat when an individual is in a place where he or she lawfully has a right to be.  Mr. Alexander also argues that trial counsel was ineffective because he failed to bring the existence of the .38 caliber shell casing to the attention of the jury, did not object to the admission of evidence related to the operation of firearms, did not object to improper statements during the State's closing argument, and misrepresented the burden of proof during his own closing.

**{¶40}**  In order to demonstrate ineffective assistance of counsel, a defendant most show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]"  *Strickland v. Washington*,

466 U.S. 668, 687 (1984). A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. *Id.* at 694. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶41} In support of his argument that trial counsel was ineffective by virtue of failing to object to omission of the amendments to Section 2901.09 from the jury instructions, Mr. Alexander directs this Court's attention to *State v. Smith*, 6th Dist. Wood No. WD-19-070, 2020-Ohio-5119. In that case, the Sixth District Court of Appeals determined that the performance of trial counsel was deficient because he agreed to jury instructions that did not incorporate amendments to the self-defense statute that became effective more than four months before his trial commenced. *Id.* at ¶ 27, 32. Nonetheless, the Sixth District determined that the appellant was not denied effective assistance of counsel, concluding that "there [was] no evidence that [he] was prejudiced by counsel's deficient performance because the evidence did not support a self-defense jury instruction." *Id.* at ¶ 33.

{¶42} In *Wood*, the Sixth District Court of Appeals considered whether trial counsel's performance was deficient in light of amendments to Section 2901.05, not Section 2901.09. *Id.* at ¶ 32. Apart from that distinction, however, even if Mr. Alexander's attorney provided representation that was deficient, his ineffective-assistance claim must fail because he has not demonstrated prejudice. As discussed above, the evidence demonstrates that the State met its burden of persuasion with respect to at least one of the elements of self-defense. Mr. Alexander has not demonstrated that a different outcome would have resulted with respect to those elements had the trial court applied Section 2901.09 as amended.

{¶43} Mr. Alexander's next argument is that trial counsel was ineffective by virtue of failing to ensure that the jury was aware that a .38 caliber shell casing had been found near J.A.'s body. As noted above, it is unclear whether there were actual misstatements regarding the shell casing during trial. In any event, however, Mr. Alexander has not demonstrated that the result of his trial would have been different but for trial counsel's performance in this regard. The trial court ultimately provided State's Exhibit 12 to the jury, and that exhibit bore an evidence sticker identifying the shell casing as .38 caliber. The evidence before the jury, therefore, included evidence regarding the .38 caliber shell casing and the inferences that could be drawn from it, but the jury found Mr. Alexander guilty nonetheless.

{¶44} Mr. Alexander maintains that trial counsel was also ineffective by failing to object to Detective Gump's testimony and to improper statements by the State during closing arguments and by misstating the burden of proof with regard to self-defense during his own closing argument. Mr. Alexander has failed to develop any meaningful argument in support of these allegations, however, and this Court declines to construct an argument on his behalf. *See State v. Smith*, 9th Dist. Medina No. 17CA0035-M, 2017-Ohio-8680, ¶ 15, citing *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8-9 (May 6, 1998). Mr. Alexander's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE CUMULATIVE EFFECT OF THE FIRST, SECOND, THIRD, FOURTH, AND FIFTH ASSIGNMENTS OF ERROR DENIED JEREMIAH ALEXANDER A FAIR TRIAL. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, U.S. CONSTITUTION; ARTICLE 1, SECTIONS 10 AND 16, OHIO CONSTITUTION. *STATE V. DEMARCO*, 31 OHIO ST.3D 191, 509 N.E.2D 1256 (1987).

**{¶45}** Mr. Alexander's sixth assignment of error argues that even if none of his alleged errors, standing alone, warrants reversal of his convictions, the cumulative effect of those errors deprived him of a fair trial.

**{¶46}** "Under the doctrine of cumulative error, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 156, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223. Because Mr. Alexander has not demonstrated the presence of multiple errors, however, the cumulative error doctrine does not apply in this case. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132. Mr. Alexander's sixth assignment of error is overruled.

## III.

**{¶47}** Mr. Alexander's assignments of error are overruled. The judgment of the Summit Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
CONCURS.

CARR, J.
DISSENTS.

APPEARANCES:

VICTORIA BADER and TIMOTHY B. HACKETT, Assistant State Public Defenders, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.